FILED
United States Court of Appeals
Tenth Circuit

February 20, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

ENERGY WEST MINING
COMPANY,

      Petitioner,

v.

JOHN OLIVER; OFFICE OF
WORKERS' COMPENSATION
PROGRAMS,

      Respondents.

No. 07-9588

---

**Petition for Review
From the Benefits Review Board
(BRB No. 07-0123-BLA)**

---

William S. Mattingly, of Jackson Kelly, PLLC, Morgantown, West Virginia, for Petitioner.

Martin J. Linnet (Jonathan Wilderman with him on the brief), of Wilderman & Linnet, P.C., Denver, Colorado, for Respondent John Oliver.

Helen H. Cox, Attorney (Gregory F. Jacob, Solicitor of Labor; Rae Ellen James, Acting Associate Solicitor; and Patricia M. Nece, Counsel for Appellate Litigation, with her on the brief), U.S. Department of Labor, Washington, D.C., for Respondent Office of Workers' Compensation Programs.

---

Before **McCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

This is a petition to review the judgment of the Department of Labor's Benefits Review Board. The Board upheld retired miner John Oliver's claim to black lung benefits from his longtime employer, Energy West Mining Company. Energy West's petition asserts two grounds for relief. First, it claims the Board's benefits award is not supported by substantial evidence. Second, Energy West argues that its liability to Mr. Oliver should be transferred to the Black Lung Disability Trust Fund—that is, to the government—because the government destroyed the records associated with a prior claim filed by Mr. Oliver in 1980. The company argues that the destruction of these records deprived it of a fair opportunity to defend Mr. Oliver's present claim, in violation of the Due Process Clause. After careful review, we deny the petition in both respects.

I

A

The Black Lung Benefits Act ("BLBA" or "Act"), 30 U.S.C. § 901 *et seq.*, compensates coal miners who become totally disabled after contracting pneumoconiosis, or black lung disease, on the job. The Act defines pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mining employment." 30 U.S.C. § 902(b). It is caused by inhaling coal dust into the lungs over a long period, and "encompasses a cruel set of conditions that afflict a significant

percentage of the nation's coal miners with 'severe, and frequently crippling, chronic respiratory impairment.'" *Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 854 (D.C. Cir. 2002) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 6 (1976)). Black lung benefits are normally paid by a miner's employer, *id.*; 30 U.S.C. § 932, but if no employer is held responsible, the claim is paid from the Black Lung Disability Trust Fund ("Black Lung Trust") administered by the government, *Nat'l Mining Ass'n*, 292 F.3d at 854.

To obtain benefits under the Act, a miner must demonstrate that he satisfies three conditions: (1) he or she suffers from pneumoconiosis; (2) the pneumoconiosis arose out of coal mining employment; and (3) the pneumoconiosis is totally disabling. *Wyoming Fuel Co. v. Dir., OWCP*, 90 F.3d 1502, 1505 (10th Cir. 1996); 30 U.S.C. § 901(a); 20 C.F.R. §§ 718.201-04. The miner must initially file a claim with a district director of the Office of Workers' Compensation Programs ("OWCP"). Either side may appeal the district director's decision to an administrative law judge ("ALJ"), then to the Board of Benefits Review, and finally to the court of appeals for the circuit in which the miner's injury occurred. *Nat'l Mining Ass'n*, 292 F.3d at 854; 33 U.S.C. § 921(c), *as incorporated by the BLBA at* 30 U.S.C. § 932(a); 20 C.F.R. §§ 725.481-82.

B

Mr. Oliver began his mining career with Energy West in 1967. Over the course of some twenty-five years, he worked at two of Energy West's Utah coal

mines. At various times, he worked as a shuttle car operator, a belt man, and finally a bath house attendant. All of these activities exposed him to coal dust. Mr. Oliver was also exposed to dust (though not of the coal variety) through his work as a cattle rancher. He now suffers from chronic obstructive pulmonary disease ("COPD"), a progressive and debilitating narrowing of the airways. Mr. Oliver now experiences shortness of breath, coughing fits, and difficulty lifting things. He is on continuous oxygen treatment.

Though COPD is not one of the diseases doctors call pneumoconiosis, it can nevertheless qualify under the legal definition of the term if it arises out of coal mining employment. A longstanding interpretation of the BLBA recognizes that Congress intended to compensate miners for "a broader class of lung diseases that are not pneumoconiosis as that term is used by the medical community." *Andersen v. Dir., OWCP*, 455 F.3d 1102, 1103-04 & n.2 (10th Cir. 2006); *see also Gulf & Western Indus. v. Ling*, 176 F.3d 226, 231-32 (4th Cir. 1999). As we noted in *Andersen*, the Labor Department codified this interpretation at 20 C.F.R. § 718.201(a). The regulation defines "legal" pneumoconiosis to encompass "any chronic lung disease or impairment and its sequelae," including "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(2); *see also Andersen*, 455 F.3d at 1104. COPD arises out of coal mining employment if it is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R.

§ 718.201(b). Because COPD is most frequently caused by cigarette smoking and is commonly found among the general population, we have held that a miner whose claim to black lung benefits is based on COPD is not entitled to the ordinary rebuttable presumption that his or her disease arose out of coal mining employment provided he worked in the mines for at least ten years. *Andersen*, 455 F.3d at 1104, 1106-07; *cf.* 30 U.S.C. § 921(c); 20 C.F.R. § 718.203(b) (establishing presumption).

Mr. Oliver filed his first claim for black lung benefits in 1980. Because OWCP destroyed the records associated with that claim in 1999 pursuant to its record-retention policy, we know very little about the claim's adjudication aside from the fact that it was denied. A memo left in place of the file suggests that, while Mr. Oliver had established the first two elements of his claim (pneumoconiosis arising out of coal mining employment), the claim was denied because he failed to show he was totally disabled in 1980. Following the denial of his original claim, Mr. Oliver continued to perform mining work for Energy West until his retirement in 1993.

Mr. Oliver filed his present claim for benefits in 2002. Because it follows a prior denial, it is a "subsequent claim" that must also be denied "unless the claimant demonstrates that one of the applicable conditions of entitlement has changed since the date upon which the order denying the prior claim became final." 20 C.F.R. § 725.309(d) (citations omitted). Under the applicable

regulations, the adjudication of a subsequent claim is subject to special procedures. First, "any evidence submitted in connection with any prior claim shall be made a part of the record in the subsequent claim." § 725.309(d)(1). Then, limiting the inquiry to those conditions of entitlement on which the prior denial was actually based, § 725.309(d)(2), if the reason for the denial relates to the miner's physical condition, the subsequent claim may be approved only "if new evidence submitted in connection with the subsequent claim establishes at least one applicable condition of entitlement," § 725.309(d)(3). Once the claimant establishes one of the previously denied elements solely on the basis of new evidence, any prior findings on the remaining elements are deprived of preclusive effect. § 725.309(d)(4). Finally, if the claimant prevails, his or her benefits are limited to the period after the prior claim was denied. § 725.309(d)(5).

The destruction of Mr. Oliver's 1980 claim file threw a wrench into these procedures. Because OWCP destroyed it, the evidence associated with the prior claim was not made a part of the record as § 725.309(d)(1) requires. As a result, both sides were deprived of whatever support that evidence might have lent them with respect to two of the three elements. Ordinarily, after establishing one of the elements by new evidence alone, a claimant would be entitled to rely on both old and new evidence to support the other two. Instead, Mr. Oliver was forced to establish *all three* elements of his claim by new evidence rather than just one,

while Energy West was forced to *defend* all three elements without the ability to counter or impeach new evidence with old.

In a hearing before the ALJ, each side pressed its case on the basis of expert medical testimony. Though the regulations establish four possible methods of proving a black lung claim—X-rays, a biopsy, applicable legal presumptions, and a physician's diagnosis based on "objective medical evidence" and "supported by a reasoned medical opinion," 20 C.F.R. § 718.202(a)—the ALJ found that Mr. Oliver could not prove his case by any of the first three methods. As a result, his proof consisted of the testimony of three doctors: Dr. Morgan, his treating physician, and Drs. Poitras and James. Energy West introduced rebuttal opinions from two of its own experts, Drs. Farney and Fino.

In a thorough thirty-page opinion, the ALJ found Mr. Oliver's experts more credible than Energy West's, placing particular reliance on the opinion of the treating physician. On the issue of the first two elements—whether Mr. Oliver had pneumoconiosis and whether it arose out of coal mining employment—the ALJ credited the opinion of all three of Mr. Oliver's doctors. She concluded that Dr. James and Dr. Poitras offered well-reasoned, well-documented opinions that were, importantly, "consistent with the opinion of [Mr. Oliver's] treating physician," Dr. Morgan. ALJ Op. at 23-24. She also noted that, unlike most COPD sufferers, Mr. Oliver has never been a smoker. *Id.* at 22. By contrast, Dr. Farney's conclusion for the company that Mr. Oliver's exposure to coal dust had

been "quite minimal" was "simply not credible." Both Mr. Oliver and a co-worker, Mr. McElprang, gave "credible and convincing" descriptions of Mr. Oliver's job site as a place filled with coal dust. Mr. McElprang testified that "the bath house was a filthy place and that coal dust was everywhere," and that in the mines themselves, "it was so dusty that the mine operator could not see the shuttle car by the time it was loaded with coal." *Id.* at 24. The ALJ similarly accorded "less weight" to Dr. Fino's opinion that Mr. Oliver suffered from asthma (not pneumoconiosis) because Dr. Fino never examined Mr. Oliver, but instead based his opinion solely on medical records; his opinion, moreover, conflicted with those of the other physicians, none of whom diagnosed Mr. Oliver with asthma. *Id.* at 24-25.

On the issue of total disability, the ALJ credited two of Mr. Oliver's physicians (Drs. Morgan and Poitras), and neither of the company's. Dr. Farney's opinion was "not well-reasoned" and conflicted with some of the ALJ's own factual findings that Mr. Oliver's job required moderate exertions with periods of heavy labor. *Id.* at 27-28. And Dr. Fino's opinion was similarly unpersuasive because he argued that test results that qualify as disabling under the regulations were in fact normal. *Id.* at 28. Chiefly on the basis of these credibility determinations, the ALJ found in favor of Mr. Oliver on all elements of his claim, and ordered Energy West to pay benefits.

The ALJ also rejected Energy West's argument that the destruction of the 1980 claim file has the effect of depriving it of due process of law. Energy West contended that it was fundamentally unfair for the government to order it to pay benefits to Mr. Oliver when it was the government—OWCP—that failed in its charge to preserve the 1980 file and produce it for use in this proceeding. Energy West argued it should be excused as the responsible party because it was unable to mount a meaningful defense, and liability for Mr. Oliver's benefits should be borne instead by the Black Lung Trust administered by OWCP. The ALJ disagreed, holding that the lost file did not impair the fundamental fairness of the proceedings.

On appeal, the Board of Benefits Review affirmed the ALJ in all respects. This petition for review followed. Because Mr. Oliver's injury allegedly occurred in Utah, we have jurisdiction to review the Board's decision. *Broyles v. Dir., OWCP*, 143 F.3d 1348, 1349 (10th Cir. 1998). We will first address its conclusion that the benefits award was supported by substantial evidence, and then turn to Energy West's due process challenge.

II

"Our task is to determine whether the Board properly concluded that the ALJ's decision was supported by substantial evidence." *Hansen v. Dir., OWCP*, 984 F.2d 364, 368 (10th Cir. 1993); Bd. Op. at 8. In making this assessment, we will not reweigh the evidence considered by the agency, but only inquire into the

*existence* of evidence in the record that "a reasonable mind might accept as adequate to support" its conclusion. *Hansen*, 984 F.2d at 368; *Kaiser Steel Corp. v. Dir., OWCP*, 748 F.2d 1426, 1430 (10th Cir. 1984). We are especially mindful that "the task of weighing conflicting medical evidence is within the sole province of the ALJ," *Hansen*, 984 F.2d at 368, and that "where medical professionals are in disagreement, the trier of fact is in a unique position to determine credibility and weigh the evidence," *id.* at 370.

Given that standard, we have no trouble concluding that the Board's decision has adequate support. The company's objections chiefly consist of challenges to the ALJ's credibility determinations. The most significant of these is an objection to the ALJ's special reliance on the opinion of the treating physician, so we will clarify that the ALJ acted properly in this respect.

Labor Department regulations require an ALJ to perform a two-step inquiry when considering the report of a claimant's treating physician. First, the ALJ must consider the extent of the physician's familiarity with the claimant in light of four factors: (1) the nature of the doctor-patient relationship, and specifically whether the physician treated the claimant for respiratory or pulmonary conditions, (2) the duration of the relationship, (3) the frequency of treatment, and (4) the extent of treatment. 20 C.F.R. § 718.104(d). Second, if these factors warrant, the ALJ may choose "to give that physician's opinion controlling weight, provided that the weight given to the opinion of a miner's treating physician shall

also be based on the credibility of the physician's opinion in light of its reasoning and documentation, other relevant evidence and the record as a whole." 20 C.F.R. § 718.104(d)(5).

The ALJ properly applied the regulatory framework to Dr. Morgan's opinion. First, the ALJ gave due consideration to the circumstances attending Dr. Morgan's report. Specifically, she found that Dr. Morgan had been Mr. Oliver's treating physician since 1995; that Dr. Morgan had treated Mr. Oliver for his respiratory problems "on a frequent basis," including caring for him during hospitalization; and that, therefore, Dr. Morgan "was in a unique position to render an opinion in this matter." ALJ Op. at 23. On that basis, the ALJ made a preliminary finding that *if* Dr. Morgan's opinion proved credible, it "may be entitled to a controlling weight." *Id.* Energy West has not challenged the accuracy of the ALJ's findings with respect to the first prong of the § 718.104(d) analysis. Then, though she ultimately declined to treat Dr. Morgan's opinion as controlling, the ALJ decided to accord it "great weight" because it appeared well-reasoned, well-documented, and consistent with the record evidence. ALJ Op. at 23, 27, 29.

Energy West claims the decision to credit Dr. Morgan's opinion lacks adequate support because it was "equivocal." Dr. Morgan recognized two contributing causes to Mr. Oliver's COPD: coal mine dust and dust exposure due to cattle ranching. But as the Board explained, Mr. Oliver was not required to

establish that coal mine dust was the *only* cause of his COPD; it is enough that his respiratory disease was "significantly related to, or substantially aggravated by" mining exposure to coal dust. *Cornett v. Benham Coal, Inc.*, 227 F.3d 569, 575 (6th Cir. 2000); 20 C.F.R. § 718.201(b). Dr. Morgan concluded Mr. Oliver's COPD was "significantly related to his dust exposure" in the coal mines, ALJ Op. at 22, which is all the regulation requires. His opinion was therefore not "equivocal" about the relevant legal question, and a reasonable mind could certainly accept the ALJ's decision to credit it. Given her preliminary findings that Dr. Morgan had extensive experience treating Mr. Oliver for respiratory disease, the ALJ's decision to rely heavily on his credible opinion was consistent with the regulations.

Energy West also appears to quarrel with the rationality of the treating physician rule as such. The company complains that a physician's opinion is only as forceful as its "power to persuade." Pet.'s Br. at 29. No doubt. But whether a medical opinion is ultimately persuasive depends on the very factors enumerated in the regulation: the nature and length of the doctor-patient relationship, the frequency and extent of treatment, the reasoning and support contained in the opinion, and the opinion's consistency with other evidence. It is precisely the object of § 718.104(d) to structure the ALJ's credibility assessment by requiring her to consider whether, in light of these factors, the treating physician's opinion really is persuasive after all. *See Nat'l Mining Ass'n*, 292 F.3d at 861-62. We

have long recognized the good sense of affording, in appropriate circumstances, special deference to the opinion of the doctor most familiar with the patient, *Hansen*, 984 F.2d at 368 (recognizing treating physician rule in this circuit, since codified with some modifications by § 718.104(d)); *Micheli v. Dir., OWCP*, 846 F.2d 632, 636 (10th Cir. 1988) (same), though we of course agree with Energy West that this deference must not be abject. Treating physicians' opinions should not "automatically be presumed to be correct." *Peabody Coal Co. v. Groves*, 277 F.3d 829, 834 (6th Cir. 2002). But here, the ALJ's deference to Dr. Morgan was manifestly *not* abject: stopping short of treating his opinion as dispositive—something the regulation contemplates, § 718.104(d)(5)—the ALJ simply treated Dr. Morgan's opinion as especially persuasive while considering the merits of each expert's report on each issue.

Having properly applied the treating physician rule, the ALJ was within her rights to afford "great weight" to Dr. Morgan's opinion. The rest of Energy West's potpourri of objections to the ALJ's credibility determinations do not warrant significant discussion. This court cannot substitute its assessment of the credibility of experts for that of the ALJ, and thus cannot accept Energy West's invitation to reexamine the weight of the medical evidence supporting the ALJ's decision. Both the Board and the ALJ have shown their work. We therefore sustain the ALJ's findings for substantially the same reasons given by the Board in its opinion.

III

We next turn to the company's argument that it was deprived of due process of law by being forced to litigate this case without the contents of Mr. Oliver's 1980 claim file. Pursuant to its record-retention policy, OWCP destroyed the file nineteen years after it was closed, in 1999. Energy West contends that, without the missing records, it was unable to mount a meaningful defense to Mr. Oliver's present claim. As a result, the company argues that the agency cannot now require it to pay benefits to Mr. Oliver without violating the Due Process Clause. It's all the same to Mr. Oliver, though: if Energy West is excused from liability, his claim will be paid from OWCP's Black Lung Trust. *See Island Creek Coal Co. v. Holdman*, 202 F.3d 873, 883-84 (6th Cir. 2000) (agency's failure to preserve records deprived employer of due process; liability imposed on Black Lung Trust); *Lane Hollow Coal Co. v. Dir.,OWCP*, 137 F.3d 799, 807 (4th Cir. 1998) (agency's excessive delay in giving notice to employer of black lung claim rendered imposition of liability unfair). But because Energy West cannot demonstrate prejudice resulting from the destruction of Mr. Oliver's 1980 claim file, we are unable to agree that imposing liability on the company would violate due process.

The Due Process Clause protects against the deprivation of life, liberty, or property by fundamentally unfair or unreliable procedures. The government must provide a litigant with "a fair opportunity to mount a meaningful defense to the

-14-

proposed deprivation of its property." *Consolidation Coal v. Borda*, 171 F.3d 175, 183 (4th Cir. 1999) (quoting *Lane Hollow*, 137 F.3d at 807)).  In some cases, it will be unnecessary for a party to show any specific prejudice in order to establish that it was prevented from mounting a meaningful defense.  For example, when the government entirely fails to give notice of a claim, or delays so excessively in providing notice that the party's ability to mount a defense is impaired, due process is offended regardless whether the party can show prejudice; the unfairness of such a procedure impugns its results.  *Betty B Coal Co. v. Dir., OWCP*, 194 F.3d 491, 501 (4th Cir. 1999); *Lane Hollow*, 137 F.3d at 807-808.

But apart from core due-process violations such as the failure to give notice or any opportunity to be heard, when (as here) a party "complains about the *course* of administrative proceedings," that party must demonstrate that the adjudication was infected by "some prejudicial, fundamentally unfair element." *Betty B Coal*, 194 F.3d at 501; *cf. Lane Hollow*, 137 F.3d at 808 (noting prejudice requirement for non-core due process challenges to the course of criminal proceedings).  That is because the Constitution is concerned with procedural outrages, not procedural glitches.  Litigation is rarely pristine and is filled with risk:  evidence gets lost, witnesses lie, judges err.  The Due Process Clause does not protect against these missteps as such.  Its interest is only in whether an adjudicative procedure as a whole is sufficiently fair and reliable that the law

-15-

should enforce its result. Thus, Energy West must demonstrate that the contents of Mr. Oliver's lost claim file were so vital to its case that it would be fundamentally unfair to make the company live with the outcome of this proceeding without access to those records.

Energy West proposes three ways in which it was prejudiced by the destruction of Mr. Oliver's 1980 claim file. First, it appears to suggest that *whenever* the government loses or destroys evidence that might impact a future adjudication, due process has been violated. Second, the company argues that materials in the original claim file might support a statute of limitations defense in the present action. Third, Energy West says that without the ability to compare the evidence introduced in this case with that introduced in 1980, it is impossible for Mr. Oliver to demonstrate (or Energy West to refute) that "one of the applicable conditions of entitlement has changed" since the denial of the original claim. 20 C.F.R. § 725.309(d) (citations omitted). We reject each of these contentions.

A

Energy West correctly points out that 20 C.F.R. § 725.309(d)(1) instructs that "[a]ny evidence submitted in connection with any prior claim shall be made a part of the record in the subsequent claim," and this instruction was not complied with in this case. But we are unable to agree that this failure is, by itself, sufficient to establish a due process violation. No one knows what the evidence

-16-

in the destroyed file would show; certainly there is no specific reason to believe it supports Energy West's position in this litigation. And even in the criminal context, when the government destroys evidence not known to be exculpatory (for example, a blood sample that has not been tested), due process is not offended in the absence of prosecutorial bad faith. *California v. Trombetta*, 467 U.S. 479, 488-89 (1984); *United States v. Smith*, 534 F.3d 1211, 1224 (10th Cir. 2008); *United States v. Beckstead*, 500 F.3d 1154, 1158 (10th Cir. 2007).[1] We do not imagine that the Due Process Clause holds the government to a higher standard when it seeks to require a coal company to pay disability benefits to one of its employees than when it seeks to deprive a citizen of his or her physical freedom. Here there is no allegation that OWCP acted in bad faith or with knowledge that the contents of the destroyed file would favor Energy West. The undisputed evidence is that OWCP destroyed the file because it thought it would no longer be useful after nineteen years gathering dust. Perhaps, in hindsight, that was unwise in light of the liberality with which successive black lung claims would be filed and the continuing relevance of prior evidence in subsequent claims. But lack of

---

[1] This situation should be distinguished from that where the withheld evidence is known to exculpate the criminal defendant. *See Brady v. Maryland*, 373 U.S. 83 (1963). In that circumstance, the only inquiry is whether there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the [criminal] proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 681-82 (1985). We need not decide today whether a similar test would apply if the contents of Mr. Oliver's 1980 claim were known and favorable to Energy West.

foresight is not the same as deliberate misconduct.  In the absence of the latter,

the mere failure to preserve evidence—evidence that may be helpful to one or the

other party in some hypothetical future proceeding—does not violate the Fifth

Amendment.[2]

The Sixth Circuit's decision in *Holdman*, on which Energy West heavily

relies, is not to the contrary.  In that case, OWCP, remarkably, lost a critical part

of the record (the transcript of the claimant's own testimony) during an *ongoing*

adjudication, making it impossible to evaluate the ALJ's findings on appeal.  The

Board concluded it "could not resolve the appeal without the completed record,"

and repeatedly dismissed it over a period of seven years.  *Holdman*, 202 F.3d. at

883.  Fourteen years after his original decision awarding benefits—and seven

years after the claimant had died awaiting final judgment—the ALJ was asked to

reconstruct the record for the Board's review.  But because the missing evidence

was "critical" to the resolution of the claim, the ALJ concluded that "the case

could not fairly be resolved without [it]."  *Id.*  The Sixth Circuit concluded that

---

[2] Analogously, in civil litigation, we require a showing of "intentional destruction or bad faith" before issuing a spoliation instruction permitting the jury to draw an adverse inference from the destruction of evidence.  *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1219-20 (10th Cir. 2008).  And even a lesser sanction, such as striking part of a party's proof, still requires that the party who destroyed the evidence "knew, or should have known, that litigation was *imminent*."  *Id.* at 1220 & n.6 (emphasis supplied) (quoting *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007)).  In this case, Energy West seeks the ultimate sanction, a judgment, but can show neither bad faith, nor intentional destruction, nor imputed knowledge of "imminent" litigation.  Nineteen years in the future is hardly imminent.

this conduct implicated the company's "core" due process rights, and excused it from liability. *Id.* at 883-84.

This case does not present such fundamental concerns. The critical fact in *Holdman* was not the unadorned loss of evidence, but rather the centrality of that evidence to the dispute and the resulting impossibility of fairly assessing the ALJ's findings without considering one of the key pieces of evidence on which those findings were actually based. But as we will discuss, *see infra* Parts III. B and C, Mr. Oliver's 1980 claim file cannot be said to be similarly "critical" to this adjudication. In fact, it is irrelevant to the issues on which Energy West claims to have been prejudiced by the file's destruction.

B

Energy West's next suggestion of prejudice relates to the statute of limitations. Under the regulations, a miner must bring a black lung claim "within three years after a medical determination of total disability due to pneumoconiosis . . . has been communicated to [him]," 20 C.F.R. § 725.308(a), and there is a presumption that all black lung claims are timely filed, 20 C.F.R. § 725.308(c). Energy West argues that materials in the 1980 claim file might reveal that Mr. Oliver received a communication of total disability from a physician long ago, "thereby rendering his current application untimely." Petr.'s Br. at 22.

Energy West is mistaken. Because black lung is a progressive disease, miners are permitted to file successive claims; if a claimant is not found to be

totally disabled at the time of their initial claim for benefits, he or she can re-file at a later time and demonstrate that the disease has advanced to point of incapacity. For this reason, we have previously recognized that "a final finding by [OWCP] that a claimant is not totally disabled due to pneumoconiosis repudiates any earlier medical determination to the contrary," and resets the statute of limitations for filing a black lung claim. *Wyoming Fuel*, 90 F.3d at 1507 (citing *Sharondale Corp. v. Ross*, 42 F.3d 993, 996 (6th Cir. 1994)). But it is not necessary to have the actual prior findings in front of us. As our sister circuit has explained, a new limitations period begins after every denial of a black lung claim, "provided the miner works in the coal mines for a substantial period of time after the denial and a new medical opinion of total disability due to pneumoconiosis is communicated [to him]." *Sharondale*, 42 F.3d at 996.

In this case, there can be no doubt that Mr. Oliver's limitations period has reset. The denial of his previous claim invalidated whatever medical opinions formed the basis of that adjudication. More importantly, he continued to perform mining work for Energy West for thirteen years after the denial of his original claim—unquestionably a substantial period. And it is not disputed here that his present claim was filed within three years of a new disability diagnosis being communicated to him by Dr. Morgan. That is all the regulations require.

C

Finally, Energy West argues that, without access to the evidence submitted in connection with the original proceeding, it is impossible to prove or disprove whether one of Mr. Oliver's conditions of entitlement (the elements of his claim) has changed since 1980—the standard for bringing a "subsequent claim" under 20 C.F.R. § 725.309(d). After a closer look at the nature of the proceedings in this particular case, however, we cannot say that the loss of the original evidence rendered the proceedings fundamentally unfair to Energy West.

The previous version of § 725.309(d) required a miner filing a second or subsequent claim for benefits to prove that there had been a "material change in conditions" since the prior denial of benefits. *Wyoming Fuel*, 90 F.3d at 1508. But the regulations did not define the phrase "material change in conditions," and a serious division of authority over its meaning emerged. In *Wyoming Fuel*, the Labor Department urged us to adopt the interpretation now codified by the regulation, the so-called "one element rule." Under that rule, a material change in condition would be inferred if "new evidence . . . establishes at least one of the elements of entitlement previously adjudicated against the miner." *Id.* at 1509. "If one element is established, a material change has been demonstrated and then the [ALJ] considers whether all the evidence of record—including evidence predating the denial of the prior claim—supports an entitlement to benefits." *Id.* The Department's interpretation was entitled to deference if reasonable, *id.* at

1510, and at the time of *Wyoming Fuel*, three of our sister circuits had upheld it, *Lisa Lee Mines v. Dir., OWCP*, 86 F.3d 1358, 1363 (4th Cir. 1996) (en banc); *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 317-18 (3d Cir. 1995); *Sharondale*, 42 F.3d at 997-98 (6th Cir. 1994). *But see Sahara Coal Co. v. OWCP*, 946 F.2d 554 (7th Cir. 1991) (adopting a different test).

We concluded, however, that the "one-element" interpretation was not reasonable. In part, we were concerned that it contravened *res judicata* principles by "allow[ing] a claimant to demonstrate a material change using only evidence that shows conditions identical to [those] presented—and rejected—at the time of the claimant's earlier claim." *Wyoming Fuel*, 90 F.3d at 1510; *accord Lisa Lee Mines*, 86 F.3d at 1366 (Luttig, J., dissenting). Having rejected the Department's interpretation of the phrase "material change in conditions," we announced our own. Under our test, a claimant was required to prove "for *each element* that actually was decided adversely to [him] in the prior denial" that the element "has worsened materially" since that denial. *Wyoming Fuel*, 90 F.3d at 1511 (emphasis supplied). To address our concern over identical conditions leading to different results, we suggested that the most straightforward way to decide whether a condition had materially worsened would be to compare the old evidence with the new. While new medical tests showing different, worsened results could satisfy our standard, a mere "new interpretation" of old evidence or identical results could not. *Id.*

*Wyoming Fuel*'s material worsening test has now been supplanted. Regulatory authorities are not always stuck with judicial interpretations of their regulations with which they are unhappy. Having been told that § 725.309(d) was not susceptible of its preferred reading, the Department of Labor availed itself of the policymaker's most efficacious remedy: it sought to rewrite the rule. In 2001, after notice and comment, the Secretary of Labor published an amended version of § 725.309(d) that codifies a new version of the one-element rule we rejected in *Wyoming Fuel*: "the [subsequent] claim shall be denied unless the claimant demonstrates that one of the applicable conditions of entitlement . . . has changed since the date upon which the order denying the prior claim became final." 20 C.F.R. § 725.309(d); *see Wyoming Fuel*, 90 F.3d at 1509-10.

The meaning and validity of this regulation are open to question. An interpretive regulation published by the Secretary of Labor explains that this amendment "allow[s] the miner to litigate his entitlement to benefits without regard to any previous findings by producing new evidence that establishe[s] any of the elements of entitlement previously resolved against him." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended ("Interpretive Regulation"), 65 F.R. 79920–01, 2000 WL 1852809, at 79968 (Dep't of Labor 2000). Once that is done, according to the Secretary, "an administrative law judge must conduct a de novo weighing of the evidence relevant to the remaining elements, regardless of whether any of that evidence is

-23-

newly submitted." *Id.* at 79973. Whether such an interpretation is consistent with the regulation's requirement that at least one essential condition of entitlement must have changed between the denial of an initial order and a later application may be subject to some debate. So may be the question whether traditional *res judicata* principles constrain the Secretary's authority to prescribe procedures for relitigating black lung claims. On the one hand, the Secretary's interpretation might permit a miner to take new, identical X-rays and then relitigate exactly the same claim over and over (albeit after the statute of limitations has reset) until he finds an ALJ who agrees with his interpretation of the medical evidence. On the other, in light of the broad authority conferred on the Secretary by Congress, such a result might be both permissible and exactly what the Secretary had in mind.

All of these, happily, are questions we need not decide in this case. At oral argument before us, Energy West conceded that, in his 1980 application, Mr. Oliver established both that he suffered from pneumoconiosis and that the disease arose out of his coal mining employment. His application failed, according to Energy West, only because he failed to establish the third and final condition of entitlement, total disability. And, the company acknowledged, Mr. Oliver has established a change of condition on that score. Indeed, even without a comparison to the lost file, it is beyond serious dispute that Mr. Oliver's disability status has changed since 1980. At the time of his original claim, Mr. Oliver

-24-

surely was not totally disabled because he continued to perform mining work until 1993. Now, the ALJ has found, his lung disease has totally disabled him from continuing that labor. Under anyone's test, that is an evident change in Mr. Oliver's condition, one established without relitigating any prior finding.

The upshot of all this is that the company cannot demonstrate prejudice from the loss of Mr. Oliver's original claim file. With respect to the one element that was found lacking in the prior claim, old evidence from the original Board proceedings is simply irrelevant because everyone concedes a material change in Mr. Oliver's disability status has occurred since then. If anything, one could argue that, under these circumstances, only *Mr. Oliver* could seriously claim prejudice by the destruction of his 1980 application materials. Because Energy West concedes that Mr. Oliver originally established both that he had pneumoconiosis and that the disease arose out of his coal mining employment, it is surely more likely that the records from the earlier proceeding would support Mr. Oliver's position with respect to those elements than Energy West's. In that scenario, and under any imaginable reading of the current rule, Mr. Oliver could be *required* to do no more than demonstrate by new evidence that he was totally disabled; he might elect to rest on the previously submitted evidence to prove the nature and cause of his disease. But because his file was destroyed, Mr. Oliver was forced to establish *all three* elements of his claim by new evidence. This he did. Energy West was likely advantaged by this additional burden on its

-25-

opponent, not disadvantaged.  In any event, we certainly cannot say that Energy West was subjected to a fundamentally unfair process.

The petition for review is denied.