**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 28, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BRIDGER COAL COMPANY,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR,

Respondent,

and

DELORES ASHMORE (Widow of and on
behalf of Merrill Lambright),

Claimant.

No. 11-9531

---

**ON PETITION FOR REVIEW OF AN ORDER**
**OF THE BENEFITS REVIEW BOARD,**
**UNITED STATES DEPARTMENT OF LABOR**
**(Nos. BRB: 08-0500 BLA and 09-0401-BLA)**

---

Ronald E. Gilbertson, Husch Blackwell LLP, Washington, DC, for Petitioner.

Barry H. Joyner, Attorney (M. Patricia Smith, Solicitor of Labor, Rae Ellen
James, Associate Solicitor, and Patricia M. Nece, Counsel for Appellate
Litigation, with him on the brief), Office of the Solicitor, U.S. Department of
Labor, Washington, D.C, for Respondent.

---

Before **KELLY**, **MURPHY**, and **O'BRIEN**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Under the Black Lung Benefits Act ("the Act"), a coal miner who is totally disabled due to pneumoconiosis[1] from coal mine employment is entitled to lifetime benefits. 30 U.S.C. § 901(a). If the miner dies due to pneumoconiosis from coal mine employment, the miner's surviving spouse is entitled to benefits. *Id.* In 2005, pursuant to the Act's administrative provisions, an Administrative Law Judge ("ALJ") awarded lifetime benefits to Merrill D. Lambright and survivor benefits to his widow, Delores Ashmore. Lambright's claims arose out of his employment with Bridger Coal Company. In 2006, a three-member panel of the U.S. Department of Labor Benefits Review Board (the "Board") vacated the ALJ's decision and remanded to the ALJ for reconsideration. In 2008, the ALJ denied benefits on both the lifetime and survivor claims. In 2009, a three-member panel of the Board reversed this decision and reinstated the 2005 ALJ's award of benefits. On reconsideration *en banc*, the full five-member Board was unable to reach a disposition in which at least three permanent members

---

[1]"The term 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902.

concurred.  As a result, the 2009 panel decision stood.  *See* 20 C.F.R. § 802.407(d).  Bridger appeals, challenging the scope of the 2009 panel's authority to review the 2008 ALJ decision, the standard used in determining whether to award benefits, and the onset-date determination.  Exercising jurisdiction pursuant to 33 U.S.C. § 921(c) and 30 U.S.C. § 932(a), this court **affirms** the 2009 panel decision.

## II.  BACKGROUND

A. Statutory Framework

To be entitled to lifetime benefits under the Act, a miner must prove (1) he suffers from pneumoconiosis; (2) which arose out of coal mining employment; and (3) caused the miner to be totally disabled.  20 C.F.R. §§ 718.202–204; *Energy W. Mining Co. v. Oliver*, 555 F.3d 1211, 1214 (10th Cir. 2009).  To be entitled to survivor benefits, a miner's eligible survivor must prove: (1) the miner had pneumoconiosis; (2) which arose out of coal mine employment; and (3) caused the miner's death.  20 C.F.R. § 718.205.  Pneumoconiosis can be "simple" or "complicated."

> Simple pneumoconiosis . . . is generally regarded by physicians as seldom productive of significant respiratory impairment. Complicated pneumoconiosis, generally far more serious, involves progressive massive fibrosis as a complex reaction to dust and other factors (which may include tuberculosis or other infection), and usually produces significant pulmonary impairment . . . . This disability limits the victim's physical capabilities, may induce death by cardiac failure, and may contribute to other causes of death.

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 7 (1976) (footnote omitted).

The Act does not use the term "complicated pneumoconiosis." However, 30

U.S.C. § 921(c)(3) creates an irrebutable presumption of total disability due to

pneumoconiosis or death due to pneumoconiosis when the diagnostic criteria for

complicated pneumoconiosis are met. *See Pittsburg & Midway Coal Mining Co.*

*v. Dir., Office of Workers' Comp. Programs*, 508 F.3d 975, 984 (11th Cir. 2007)

(discussing legislative history of the Act). Section 921(c)(3) provides:

> If a miner is suffering or suffered from a chronic dust disease of the
> lung which (A) when diagnosed by chest roentgenogram, yields one
> or more large opacities (greater than one centimeter in diameter) and
> would be classified in category A, B, or C in the International
> Classification of Radiographs of the Pneumoconioses by the
> International Labor Organization, (B) when diagnosed by biopsy or
> autopsy, yields massive lesions in the lung, or (C) when diagnosis is
> made by other means, would be a condition which could reasonably
> be expected to yield results described in clause (A) or (B) if
> diagnosis had been made in the manner prescribed in clause (A) or
> (B), then there shall be an irrebuttable presumption that he is totally
> disabled due to pneumoconiosis or that his death was due to
> pneumoconiosis, or that at the time of his death he was totally
> disabled by pneumoconiosis . . . .

30 U.S.C. § 921(c)(3); *see also* 20 C.F.R. § 718.304[2] (implementing regulation).

---

[2]20 C.F.R. § 718.304, the implementing regulation for § 921(c)(3), provides:

There is an irrebuttable presumption that a miner is totally disabled due to pneumoconiosis, that a miner's death was due to pneumoconiosis or that a miner was totally disabled due to pneumoconiosis at the time of death, if such miner is suffering or suffered from a chronic dust disease of the lung which:

(a) When diagnosed by chest X-ray (see § 718.202 concerning the standards for X-rays and the effect of interpretations of X-rays by physicians) yields one or more large opacities (greater than 1 centimeter in diameter) and would be classified in Category A, B, or C in:

> (1) The ILO–U/C International Classification of Radiographs of the Pneumoconioses, 1971, or subsequent revisions thereto; or
>
> (2) The International Classification of the Radiographs of the Pneumoconioses of the International Labour Office, Extended Classification (1968) (which may be referred to as the "ILO Classification (1968)"); or
>
> (3) The Classification of the Pneumoconioses of the Union Internationale Contra Cancer/Cincinnati (1968) (which may be referred to as the "UICC/Cincinnati (1968) Classification"); or

(b) When diagnosed by biopsy or autopsy, yields massive lesions in the lung; or

(c) When diagnosed by means other than those specified in paragraphs (a) and (b) of this section, would be a condition which could reasonably be expected to yield the results described in paragraph (a) or (b) of this section had diagnosis been made as therein described: Provided, however, that any diagnosis made under this paragraph shall accord with acceptable medical procedures.

Section 921(c)(3) thus provides three means by which a miner can prove complicated pneumoconiosis: x-ray, autopsy, or other equivalent evidence.

Regarding the second of these, the Act does not define the term "massive lesions" for purposes of applying clause (B) of the § 921(c)(3) presumption. Two other circuits have considered the showing necessary for a claimant to obtain the benefit of the presumption using autopsy evidence. The Fourth Circuit has held § 921(c)(3) implicitly requires an "equivalency determination," i.e., a claimant seeking to prove complicated pneumoconiosis under the "massive lesions" clause of § 921(c)(3) must show that such lesions would show up as one-centimeter-or-greater opacities if detectable by chest x-ray. *See, e.g., E. Associated Coal Corp. v. Dir., Office of Workers' Comp. Programs*, 220 F.3d 250, 255–56 (4th Cir. 2000), *Double B Mining, Inc. v. Blankenship*, 177 F.3d 240, 243 (4th Cir. 1999). The Eleventh Circuit, by contrast, rejects the "equivalency determination" requirement. *Pittsburg & Midway*, 508 F.3d at 987 n.7. Under the Eleventh Circuit approach, "[i]t is sufficient if the claimant can establish by a preponderance of the evidence that the miner's autopsy or biopsy results are consistent with a diagnosis of complicated pneumoconiosis under accepted medical standards." *Id.* at 986.

B. Lambright's Claim

Lambright filed a claim for black lung benefits on March 19, 1998, while he was still employed as a coal mine welder by Bridger. His last day of work was

June 26, 1998, and he died on January 31, 2002. Upon Lambright's death, Dr. Michael J. Dobersen, the medical examiner for Arapahoe County, Colorado, conducted an autopsy. Dr. Dobersen is board certified in anatomic, clinical, and forensic pathology. His macroscopic examination of Lambright's lungs revealed "extensive anthracosis with focal irregular areas of anthracotic scarring, some of which measure up to 2½ inches in greatest dimension." He attributed Lambright's death "to complications of complicated coal workers' pneumoconiosis (progressive massive fibrosis) also known as black lung disease. A component of silicosis was also apparent. Evidence of severe cor pulmonale was also apparent."

Bridger retained two pathologists to review Dr. Dobersen's findings, Drs. Erika Crouch and Joseph Tomashefski. Dr. Crouch is board certified in anatomic pathology. She reviewed Dr. Dobersen's report, autopsy slides, and other of Lambright's medical records before issuing an opinion on December 3, 2002. Dr. Crouch concluded Lambright suffered from "simple coal workers' pneumoconiosis and simple siderosis arising from welding as well as centriacinar emphysema, acute bronchopneumonia, and changes consistent with severe pulmonary hypertension." Reviewing the autopsy slides, she observed "no areas of 'massive fibrosis or complicated silicosis'" and described the lesions she did observe as "relatively small in size and number." Dr. Crouch ruled out Lambright's pneumoconiosis as a significant contributing factor to his death. Dr.

Tomashefski is board certified in clinical and anatomical pathology. He concluded Lambright suffered from mild simple coal workers' pneumoconiosis and mild centracinar emphysema, and that the simple pneumoconiosis did not cause or contribute to Lambright's death. Dr. Tomashefski ruled out complicated pneumoconiosis because the largest coalescent, pneumoconiotic lesion he observed from the autopsy slides measured less than two centimeters in diameter, which was below the minimum size required for a diagnosis of complicated pneumoconiosis. *See* 20 C.F.R. § 718.304.

The 2005 ALJ decision credited the opinion of Dr. Dobersen over the contrary opinions of Drs. Crouch and Tomashefski for four reasons. First, Dr. Dobersen was the prosector, and therefore the only reviewing pathologist who made first-hand observations of Lambright's lungs.[3] Second, Dr. Dobersen's report provided very specific measurements and detailed findings, including the 2.5 inch (6.35 cm) lesion. Third, the ALJ concluded Dr. Dobersen demonstrated understanding of the concepts of simple and complicated pneumoconiosis. Finally, the ALJ concluded Dr. Dobersen had superior qualifications because he was board certified in more sub-disciplines of pathology than Drs. Crouch or Tomashefski. The ALJ also reviewed the medical evidence, including chest x-rays, CT-scans, hospitalization and treatment records, and medical opinion

_____

[3]The ALJ made clear Dr. Dobersen's opinion was not accorded greater weight for this reason alone.

evidence. The ALJ nonetheless concluded the autopsy evidence was the most compelling and accorded the most weight to Dr. Dobersen's opinion. Applying the irrebutable presumption of 20 C.F.R. § 718.304, the ALJ awarded benefits on both the lifetime and survivor claims. The ALJ concluded the lifetime benefit onset date was March, 1998, the month in which Lambright filed his claim. The survivor benefit onset date began January, 2002, the month of Lambright's death.

C. Subsequent Proceedings

Bridger appealed the 2005 ALJ decision to the Board. Pursuant to 33 U.S.C. § 921(5), Bridger's appeal was heard by a three-member panel. This court had not yet decided what showing was necessary for a claimant to be entitled to the irrebutable presumption created by § 921(c)(3) of the Act. The panel therefore looked to Fourth Circuit law for guidance in deciding this issue. *See Shuff v. Cedar Coal Co.*, 967 F.2d 977, 980 (4th Cir. 1992) (concluding board did not act in good faith by completely ignoring out-of-circuit precedent simply because it was out-of-circuit). Applying the Fourth Circuit's *Eastern Associated Coal* and *Double B Mining* opinions, the panel vacated the 2005 ALJ decision because it "did not determine that the medical evidence established that the node seen on CT scan, or the lesion seen on autopsy, would be seen on x-ray as an opacity greater than one centimeter, and there is no evidence in the record which would support such a determination." The panel remanded the case to the ALJ to determine whether Lambright suffered from total disability and/or death due to

pneumoconiosis, 20 C.F.R. §§ 718.204(b), (c), 718.205(c), notwithstanding the unavailability of the § 921(c)(3) irrebutable presumption.

In a 2008 decision on remand, the ALJ concluded Ashmore failed to prove either total disability or death due to pneumoconiosis by a preponderance of the evidence. The 2008 ALJ decision relied principally on the opinions of Drs. Crouch, Tomashefski, and Tuteur.[4] Those opinions were credited over the contrary opinion of Dr. Dobersen because, the ALJ concluded, the 2006 decision of the Board "discredited the opinion of Dr. Doberson [sic] that the pathology slides showed complicated pneumoconiosis as the Board held that there is no evidence in the record, which would include the death certificate and autopsy report of Dr. Doberson [sic], which would support a finding of complicated pneumoconiosis." On the lifetime claim, reviewing the medical evidence, the ALJ found Lambright suffered from simple pneumoconiosis and cor pulmonale, but concluded the pneumoconiosis was insufficient to have caused his disabling pulmonary impairment. The ALJ similarly resolved the survivor claim, concluding Lambright's simple pneumoconiosis was insufficient to have caused or contributed to his death.

_____

[4]Dr. Peter G. Tuteur, board certified in internal medicine and pulmonary medicine was another of Bridger's medical experts. He reviewed Lambright's medical records and issued a report which concluded Lambright suffered from simple pneumoconiosis which was insufficient to cause or hasten his death.

In 2009, Ashmore, proceeding *pro se*, appealed the 2008 ALJ decision. By this time, the Eleventh Circuit had decided *Pittsburg & Midway*, which created a circuit split on the issue of whether equivalency determinations were necessary in applying the irrebutable presumption of pneumoconiosis set forth in § 921(c)(3) and its implementing regulation, 20 C.F.R. § 718.304. The Board, again acting through a three-member panel, ordered supplemental briefing on what standard it should apply in reviewing the ALJ's 2008 decision and whether it should reaffirm the 2005 ALJ decision in the event it applied the Eleventh Circuit standard. Concluding the Eleventh Circuit's interpretation of § 921(c)(3) was superior to that of the Fourth Circuit, the Board vacated its 2006 Decision and Order and reinstated the 2005 ALJ Decision and Order awarding benefits.

Bridger filed a motion for reconsideration and suggestion for reconsideration *en banc* of the 2009 panel decision, which the full five-member Board considered. The *en banc* panel could not reach a disposition in which at least three permanent members of the Board concurred. Two members of the *en banc* Board would have affirmed the 2009 panel decision, two members of the *en banc* Board would have reversed the 2009 panel decision, and one member of the *en banc* Board would have affirmed the 2009 panel's adoption of the Eleventh Circuit's § 921(c)(3) standard but remanded the case to the ALJ to apply it in the first instance. Therefore, pursuant to 20 C.F.R. § 802.407(d), the 2009 three-member panel decision was left undisturbed.

## III.  DISCUSSION

### A.  Standard of Review

Bridger's appeal presents issues of statutory and regulatory interpretation as well as challenges to the factual findings of the ALJ.  The issues of statutory and regulatory interpretation are reviewed de novo.  *Andersen v. Dir., Office of Workers' Comp. Programs*, 455 F.3d 1102, 1103 (10th Cir. 2006).  However, "[o]ur review of alleged errors of law, and the effect they may have had on the benefits decision, must be made in light of the premise that the Act is intended to be remedial in nature, and doubts should be resolved in favor of the disabled miner or his or her survivors."  *Bosco v. Twin Pines Coal Co.*, 892 F.2d 1473, 1476 (10th Cir. 1989) (quotations and alterations omitted).  In reviewing the challenges to the factual findings of the ALJ, this court's task is to determine whether the Board properly concluded the decision of the ALJ was supported by substantial evidence.  *Energy W. Mining Co.*, 555 F.3d at 1217.  On substantial evidence review, the court "will not reweigh the evidence considered by the agency, but only inquire into the existence of evidence in the record that a reasonable mind might accept as adequate to support its conclusion."  *Id.* (quotation and emphasis omitted).  "Additionally, the task of weighing conflicting medical evidence is within the sole province of the ALJ."  *Hansen v. Director, Office of Workers' Comp. Programs*, 984 F.2d 364, 368 (10th Cir. 1993).

-12-

B. Scope of Board's Authority

Bridger first argues the 2009 panel decision is invalid because a majority of the full Board did not vote for its outcome. Because the 2009 panel decision was based on a 2-1 majority, and because no additional members of the *en banc* Board voted to affirm the panel decision, Bridger argues, it would be improper to allow two members of a five-member board to control the outcome of the case. Bridger's argument misconstrues the statutory structure governing the Board's review authority. The Board is composed of five members and is empowered to "hear and determine appeals . . . from decisions with respect to claims of employees" under the Act. 33 U.S.C. § 921(b)(1), (3)[5]. Further,

> The Board is authorized to delegate to panels of three members any or all of the powers which the Board may exercise. . . . Official adjudicative action may be taken only on the affirmative vote of at least two members of a panel. Any party aggrieved by a decision of a panel of the Board may . . . petition the entire permanent Board for review of the panel's decision. Upon affirmative vote of the majority of the permanent members of the Board, the petition shall be granted.

*Id.* § 921(b)(5). Here, the Board delegated its power to hear Ashmore's appeal from the 2008 ALJ decision to a three-member panel. On the affirmative vote of two members of the panel, the 2008 ALJ decision was reversed and the 2005 ALJ decision was reinstated. Bridger petitioned the entire permanent five-member

---

[5]The Act incorporated the benefit review provisions of the Longshore and Harbor Workers' Compensation Act for claims arising after December 31, 1973. 30 U.S.C. § 932(a).

-13-

Board for review of the panel's decision.[6]  However, there was no "affirmative vote of the majority of the permanent members of the Board" granting the relief Bridger requested.  Instead, the *en banc* Board was divided 2-2-1 and could not reach a consensus on any disposition.  The Board therefore properly left the 2009 panel decision undisturbed.  *See Curry v. Beatrice Pocahontas Coal Co.*, 67 F.3d 517, 522 n.8 (4th Cir. 1995) (stating where three members of Board did not vote affirmatively to "vacate" decision under review, Board's action constitutes "affirmance-by-necessity" subject to judicial review as an effective affirmance).

Bridger next argues the 2009 panel lacked authority to review and reinstate the 2005 ALJ decision after it concluded its prior reversal of that decision, and the subsequent 2008 ALJ decision on remand, was erroneous.  We reject this argument.  33 U.S.C. § 921(b)(3) provides:

> The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter and the extensions thereof.  The Board's orders shall be based upon the hearing record.  The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole.

---

[6]In its Reply Brief, Bridger argues the "actual decision under review" by the *en banc* Board was not the 2009 panel decision at all, but rather, the 2008 ALJ order denying benefits after remand from the 2006 panel decision.  This argument is implausible.  The statutory scheme contemplates *en banc* review of an adverse *panel* decision, not an adverse ALJ decision.  *See* 33 U.S.C. § 921(b)(5).  Moreover, it was the 2009 panel decision from which Bridger sought reconsideration and requested rehearing *en banc*.

-14-

The relevant regulations further describe the scope of the Board's review

authority:

> The Benefits Review Board is not empowered to engage in a de novo proceeding or unrestricted review of a case brought before it. The Board is authorized to review the findings of fact and conclusions of law on which the decision or order appealed from was based. Such findings of fact and conclusions of law may be set aside only if they are not, in the judgment of the Board, supported by substantial evidence in the record considered as a whole or in accordance with law.

20 C.F.R. § 802.301(a). Bridger's reading of these provisions restricting the

Board's authority elevates form over substance. Reviewing the 2008 ALJ

decision in light of what it considered new developments in the law on the

§ 921(c)(3) presumption, the Board determined that decision was not "in

accordance with law." Although the Board went on to "reconsider whether the

administrative law judge's 2005 Decision and Order . . . is supported by

substantial evidence and in accordance with applicable law," such

"reconsideration" necessarily occurred within the scope of its initial review of the

ALJ's 2008 order. Moreover, Bridger's supplemental brief reiterated its

objections to the 2005 ALJ decision. Having concluded the ALJ applied the

wrong legal standard in its 2008 decision, the Board in its discretion could have

remanded the case to the ALJ for a third hearing to apply the Eleventh Circuit

-15-

approach to the § 921(c)(3) presumption.[7]  However, none of the statutes or authorities Bridger cites indicate such remand was required.[8]

Bridger also argues the Board was precluded by the law of the case doctrine from reconsidering its prior approach to the complicated pneumoconiosis issue. Initially, Bridger cites no authority, and the court is unaware of any, indicating the law of the case doctrine applies between administrative courts. *See Andersen v. U.S. Dep't of Labor*, 422 F.3d 1155, 1180 n.50 (10th Cir. 2005).  Assuming without deciding law of the case does apply, Bridger overstates the breadth of the doctrine.  Bridger characterizes the law of the case doctrine as a rigid rule that "an issue once litigated and decided in a case is put to an end," absent an intervening change in controlling law which dictates a different result.  Bridger is correct that, "[g]enerally, the 'law of the case' doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case." *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224 (10th Cir. 2007). However, "the rule is a flexible one that allows courts to depart from erroneous

---

[7]Indeed, this was the preferred disposition of the fifth *en banc* Board member.

[8]Bridger's reliance on *Bartley v. L & M Coal Co.*, 901 F.2d 1311 (6th Cir. 1990), is misplaced.  *Bartley* concerned *the court's* jurisdiction to review an ALJ decision which was subsequently vacated by the Board and superseded by a new decision and order by the ALJ on remand.  *See* 901 F.2d at 1312.  The Sixth Circuit stated it did not have such authority, as its jurisdiction is limited to review of final orders from the Board.  *Id.*  Here, the scope of this court's jurisdiction is not at issue, as Bridger's appeal is from a final order of the 2009 three-member panel of the Board.

prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power . . . ."  *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007) (citation omitted); *see also United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 199 (1950) (characterizing the law of the case doctrine as "only a discretionary rule of practice").

Even if it were bound by the law of the case doctrine, therefore, the Board appropriately exercised its discretion to depart from the doctrine here. Intervening binding law from the controlling circuit is not the only circumstance in which it is reasonable for the Board to reconsider its prior interpretation of governing law.  The development of a circuit split on an issue central to the Board's resolution of a case that occurs during the pendency of that case is a legitimate reason for the Board to reconsider prior rulings.

C.  Standard for Applying 30 U.S.C. § 921(c)(3) and 20 C.F.R. § 718.304

This court has not considered what showing is necessary for a claimant, like Ashmore, who relies on the "massive lesions" prong of § 921(c)(3) of the Act to claim entitlement to the irrebutable presumption of disability and/or death due to pneumoconiosis.  Neither the Act itself nor its implementing regulations define the term "massive lesions."  Under the approach of the Fourth Circuit,[9] to obtain

---

[9]The court disagrees with Bridger's assertion that the Fourth Circuit's requirement of equivalency determinations is followed by the Third and Sixth Circuits.  In *Clites v. Jones & Laughlin Steel Corp.*, 663 F.2d 14, 16 (3d Cir. 1981), the Third Circuit held equivalency determinations were necessary to apply

(continued...)

the benefit of the § 921(c)(3) presumption, a claimant relying on autopsy

evidence as set forth in clause (B) of the statute must show such lesions would, if

measured by x-ray, produce opacities greater than one centimeter as set forth in

clause (A) of the statute. *Double B Mining*, 177 F.3d at 243. The central

justifications for this approach were stated in *Double B Mining*:

> Because clauses (A), (B), and (C) of § 921(c)(3) are three different ways of diagnosing complicated pneumoconiosis, in construing the requirements of each, one must perform equivalency determinations to make certain that regardless of which diagnostic technique is used, the same underlying condition triggers the irrebuttable presumption. In other words, the same condition that triggers the presumption by producing opacities greater than one centimeter in diameter on an x-ray should be considered "massive lesions" under the statute if diagnosed through biopsy. By explicitly referencing prongs (A) and (B) as guides, prong (C) of the statute requires "plainly that equivalency determinations shall be made." Logic commands that prongs (A) and (B) be similarly equivalent. Any other rule would lead to the irrational result that the determination of whether a miner has totally disabling pneumoconiosis could turn on the method of diagnosis rather than on the severity of his disease.

> Because prong (A) sets out an entirely objective scientific standard, it provides the mechanism for determining equivalencies under prong (B) or prong (C). In prong (A), Congress mandated that the condition that triggers the irrebuttable presumption is one that creates, on an x-ray, at least one opacity greater than one centimeter in diameter. When that condition is diagnosed by biopsy rather than

---

[9](...continued)
*clause (C)* of § 921(c)(3), but did not decide whether such a requirement is implicit in clause (B). The Sixth Circuit, in *Gray v. SLC Coal Co.*, 176 F.3d 382, 390 (6th Cir. 1999), stated the § 921(c)(3) presumption could be invoked only if an autopsy physician opined that a lesion discovered during autopsy would produce an opacity of greater than one centimeter if viewed by x-ray *or* that such lesion constitutes a "massive lesion."

x-ray, it must therefore be determined whether the biopsy results show a condition that would produce opacities of greater than one centimeter in diameter on an x-ray. That is to say, "massive lesions," as described in prong (B), are lesions that when x-rayed, show as opacities greater than one centimeter in diameter.

*Id.* (citation omitted).

The Eleventh Circuit described "at least four basic shortcomings" with the equivalency determination requirement of the Fourth Circuit. *Pittsburg & Midway*, 508 F.3d at 987 n.7. First, the Fourth Circuit's approach conflates clause (A) with clause (B) of § 921(c)(3). Congress used the term "or" when setting forth the three ways complicated pneumoconiosis could be established under § 921(c)(3), indicating alternatives were intended. *Id.* Second, reading clause (B) to require an equivalency determination would make it superfluous in light of clause (C), which makes the irrebutable presumption applicable where a claimant shows, by "other means," a condition which would be expected to yield results described in parts (A) and (B). *Id.* Third, citing Supreme Court precedent and the legislative history of the Act, the Eleventh Circuit noted autopsy examinations frequently reveal a greater prevalence of pneumoconiosis than x-ray examinations. *Id.* (citing *Usery*, 428 U.S. at 32). Fourth, the equivalency determination requirement appears to conflict with the Act's mandate that claims not be denied solely on the basis of negative x-ray results. *Id.* (citing 208 U.S.C. § 923(b)).

-19-

This court is persuaded by the approach of the Eleventh Circuit. Requiring "equivalency determinations" in applying the § 921(c)(3) presumption is contrary to the plain language of the statute and, thus, inconsistent with congressional intent. The Fourth Circuit's rationale that "logic commands" equivalency determinations be implied in interpreting clauses (A) and (B) because they are expressly required by clause (C) is unpersuasive. To the extent clause (C) demonstrates Congress knew how to require equivalency determinations through the use of specific language in one part of the statute, the lack of similar language in another part of the statute indicates congressional intent *not* to require such determinations. *See United States v. Salas-Mendoza*, 237 F.3d 1246, 1248 (10th Cir. 2001). Additionally, it is not at all "irrational" that claimants in some cases will be able to demonstrate entitlement to benefits under one clause of the statute even if they are unable to demonstrate such entitlement under another clause. When Congress provides multiple methods by which claimants can demonstrate entitlement to benefits, it is to be expected such claimants will attempt to prove their claims using the easiest method available to them. This result is also consistent with the broad remedial purposes of the Act. *See Magnus v. Dir., Office of Workers' Comp. Programs*, 882 F.2d 1527, 1531 (10th Cir. 1989). Moreover, regardless of whether equivalency determinations are required, the ALJ is not relieved of its obligation to consider "all relevant evidence" in making a benefits determination. *See* 30 U.S.C. § 923(b).

Bridger argues the 2005 ALJ decision was not supported by substantial evidence even if no equivalency determination is required. This court disagrees. The 2005 ALJ decision involved the weighing of conflicting medical evidence, i.e., the weighing of the opinion of Dr. Dobersen against the contrary opinions of Drs. Crouch, Tomashefski, and Tuteur. Such weighing is the sole province of the ALJ and cannot be disturbed by this court on substantial evidence review. *Hansen*, 984 F.2d at 368. As Bridger acknowledges, Lambright's medical history was extremely complex. The opinion of the ALJ reviewed Lambright's medical history and included a detailed discussion of the opinions of Drs. Dobersen, Crouch, Tomashefski, and Tuteur, as well as more than a dozen other doctors who either treated or examined Lambright or analyzed his medical records. The ALJ found the autopsy evidence the most compelling and credited the opinion of Dr. Dobersen over the contrary opinions of Drs. Crouch and Tomashefski.

The ALJ provided four reasons for preferring the opinion of Dr. Dobersen: his board certifications in the most sub-disciplines of pathology, his position as prosector, his detailed findings, and his demonstrated understanding of complicated and simple pneumoconiosis. Dr. Dobersen's opinion included an observation of a 2.5 inch (6.35 cm) lesion of anthracotic scarring in Lambright's lung, which was consistent with one of Bridger's doctor's observation of a "large node" on earlier CT scans. Although Bridger claims this observation was unsupported by Drs. Crouch and Tomashefski, Bridger does not attempt to argue

-21-

such a lesion would not qualify as "massive" under § 921(c)(3)(B). While the other reasons Bridger advances for preferring the opinions of its experts over that of Dr. Dobersen might be persuasive on *de novo* review, they ultimately amount to invitations to re-weigh the evidence, which this court may not do. *See Energy W. Mining Co.*, 555 F.3d at 1217.

D. Benefits Award Period

Bridger challenges the ALJ's award of benefits on Lambright's lifetime claim commencing in March, 1998, the month in which his claim was first filed. Bridger does not suggest an alternative entitlement date. A miner is entitled to benefits under the Act beginning the month he becomes totally disabled due to pneumoconiosis. 20 C.F.R. § 725.503(b). If the evidence does not establish the onset date of the miner's total disability, benefits become payable the month the miner filed his claim. *Id.* However, if the evidence affirmatively shows the miner was not disabled for some period of time after the claim filing date, benefits cannot be backdated to the filing date. *Dir., Office of Workers' Comp. Programs v. Gurule*, 653 F.2d 1368, 1371–72 (10th Cir. 1981), *abrogated on other grounds by Lukman v. Dir., Office of Workers' Comp. Programs*, 896 F.2d 1248, 1250–51 (10th Cir. 1990); *see also Rochester & Pittsburgh Coal Co. v. Krecota*, 868 F.2d 600, 603–04 (3d Cir. 1989). Because a miner with complicated pneumoconiosis is irrebutably presumed to be totally disabled, *see supra* Part II.A.*,* a miner is entitled to benefits the month his simple pneumoconiosis

becomes complicated pneumoconiosis, or, if the onset date of complicated pneumoconiosis cannot be determined, the month he filed his claim.

The exact month Lambright's simple pneumoconiosis became complicated pneumoconiosis cannot be determined because the diagnosis of complicated pneumoconiosis came from Dr. Dobersen's autopsy report. Therefore, absent an affirmative showing that Lambright did not have complicated pneumoconiosis, an award of lifetime benefits as of his filing date was appropriate. Bridger argues the onset date for Lambright's lifetime benefits can be no earlier than the month of his death because Dr. Dobersen's autopsy was the first diagnosis of complicated pneumoconiosis. The autopsy evidence, however, does not establish the date of onset, but merely shows Lambright developed complicated pneumoconiosis at some point prior to his death. "It is well recognized that pneumoconiosis is often a latent, progressive and insidious disease and therefore evidence establishing total disability due to pneumoconiosis may relate backward in time to establish an earlier onset date in the absence of earlier contradictory *like evidence*." *Gurle*, 653 F.2d at 1368 (emphasis added).[10] Therefore, to establish a benefits onset date subsequent to Lambright's claim-filing date,

_____

[10]In support of its argument Bridger relies on two prior ALJ decisions. *See Gruller v. BethEnergy Mines, Inc.*, 11 Black Lung Rep. 3-316 (1988); *Gordon v. Cedar Coal Co.*, 13 Black Lung Rep. 3-146 (1989). These decisions have no precedential value and are not binding on this court.

Bridger must point to "earlier contradictory like evidence" disproving the presence of complicated pneumoconiosis.

In this respect, Bridger points to x-ray, CT-scan, biopsy, and medical opinion evidence produced prior to Lambright's death which did not diagnose complicated pneumoconiosis. This showing is inadequate. As both Congress and the Supreme Court have recognized, x-ray evidence is not a reliable indicator of the absence of complicated pneumoconiosis, particularly when weighed against contrary autopsy evidence. *See Usery*, 428 U.S. at 31–32. The CT-scan evidence is not wholly inconsistent with Dr. Dobersen's diagnosis of complicated pneumoconiosis. As early as 2000, one of the CT-scans revealed the presence of a "large mass" which the 2005 ALJ considered consistent with Dr. Dobersen's observation of a 2.5 inch lesion of anthracotic scarring. By rule, negative biopsy evidence cannot establish the absence of pneumoconiosis. 20 C.F.R. § 718.106(c). Lastly, as set forth *supra* Part III.C., the decision of the ALJ to credit the opinion of Dr. Dobersen over the contrary opinions of Bridger's experts was rational and supported by substantial evidence.

Bridger also attempts to avoid this result by characterizing the ALJ's award of benefits to Lambright as subsequent to a modification proceeding. After a finding of entitlement, the Act permits the district director to modify an award on his own motion or upon request of either party. 33 U.S.C. § 922; 30 U.S.C. § 932(a) (incorporating modification provisions of Longshore and Harbor

-24-

Workers' Compensation Act). Modification may be granted based on a change in conditions or because of a mistake in a determination of fact. 33 U.S.C. § 922; 30 U.S.C. § 932(a); 20 C.F.R. § 725.310(a) (1999). When the grant of a modification request is based on a change in conditions and the evidence does not establish the onset date of total disability due to pneumoconiosis, benefits are payable as of the date of the modification request rather than the initial filing date. 20 C.F.R. § 725.503(d)(2). The default entitlement date does not change, however, when a modification request is granted based on mistake of fact. Bridger therefore argues the decision of the ALJ was preceded by a grant of a "change in conditions" modification request based on Lambright's death, and so benefits cannot be backdated further than the month of death.[11] This argument is not supported by the record.

Lambright initially filed his claim for lifetime benefits in March 1998. On December 21, 1998, the district director entered a determination of entitlement, awarding lifetime benefits to Lambright. Bridger subsequently requested modification of this award. On February 23, 2001, pursuant to Bridger's request, the director issued a "*Proposed* Decision and Order Approving Request for Modification After Remand." The director suspended payment of benefits pending the final adjudication of Lambright's claim. The order also specified: "If

---

[11]Bridger's interpretation of the proceedings would therefore entitle Lambright to one month of lifetime benefits. *See* 20 C.F.R. § 725.502(c).

-25-

no request for a formal hearing is received within 30 . . . days from the date of this Proposed Order . . ., the proposed order will be deemed to have been accepted by all parties and the findings set forth herein shall become final." On March 14, 2001, within the appropriate thirty-day window, Lambright requested a hearing before an ALJ. Before that request was acted on, Lambright died.

On March 19, 2002, Ashmore filed her claim for survival benefits and submitted additional medical evidence, including Dr. Dobersen's autopsy report. The claim was not styled as a request for modification. Nonetheless, on August 3, 2002, the district director issued a new order, styled as a "Proposed Decision and Order Granting Request for Modification," which awarded Ashmore benefits on Lambright's lifetime claim and on her survivor claim. The Decision and Order thereby disposed of all pending motions, implicitly denying Bridger's original motion for modification which had not yet been finally ruled on. Thus, it appears the director interpreted Ashmore's motion as a motion for modification based on change in conditions, but only to the extent Ashmore alleged she was entitled to additional (survivor) benefits due to Lambright's death. To the extent the order granting modification was based on a change in conditions, the ruling only implicated the claim for survivor benefits, not Lambright's original claim for lifetime benefits. Therefore, there are no grounds for a change in the default entitlement date for Lambright's lifetime benefits.

## IV. Conclusion

For the foregoing reasons, the decision of the Board is **AFFIRMED**.