EID, Circuit Judge.
*994 Peabody Twentymile Mining, LLC ("Peabody Twentymile") operates the Foidel Creek Mine, a large underground coal mine in Colorado. The mine uses over one thousand ventilation stoppings to separate the fresh intake air from the air flowing out of the mine that has been circulated through areas where extraction is occurring. Federal law requires permanent ventilation stoppings to be "constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately." 30 C.F.R. § 75.333(e)(1)(i). In 2014, an inspector for the Mine Safety and Health Administration ("MSHA") issued a citation to Peabody Twentymile for a violation of this safety standard because it had used polyurethane spray foam to seal the perimeter of a permanent concrete block ventilation stopping.
Peabody Twentymile unsuccessfully contested the citation and civil penalty before an administrative law judge ("ALJ"). The ALJ relied on the preamble to the ventilation stopping regulation, which listed six "traditionally accepted construction methods," to determine that Peabody Twentymile's method of constructing concrete block stoppings was not "traditionally accepted" and was subject to a $162 fine. Peabody Twentymile then petitioned the Federal Mine Safety and Health Review Commission (the "Commission") for review, and the Commission issued an evenly split decision, causing the ALJ's decision to stand. Peabody Twentymile now petitions for judicial review of the ALJ's decision. Exercising jurisdiction under 30 U.S.C. § 816(a)(1), we grant Peabody Twentymile's petition for review. Because we conclude that Peabody Twentymile's construction method was "traditionally accepted" by MSHA under the unambiguous meaning of that phrase, we reverse the ALJ's decision and vacate the citation.
I.
"Section 101(a) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 811(a), directs the Secretary of Labor to establish mandatory health and safety standards for mines. Under this authority the Secretary has promulgated a set of regulations governing underground-coal-mine ventilation." Plateau Mining Corp. v. Fed. Mine Safety & Health Review Comm'n , 519 F.3d 1176, 1180 (10th Cir. 2008) (citing 30 C.F.R. §§ 75.300 - 75.389 ). These regulations set forth generally applicable standards for mine ventilation systems and require each mine operator to develop and follow a mine-specific ventilation control plan, which must be approved by an MSHA district manager. See id. (citing 30 C.F.R. § 75.370(a) ).
Here, the relevant regulation, 30 C.F.R. § 75.333(e)(1)(i), concerns the construction of mine ventilation stoppings. Ventilation stoppings protect miners from noxious air and help maintain the integrity of the mine's escapeways by separating clean intake air from polluted outgoing air. The regulation mandates:
Except as provided in paragraphs (e)(2), (3) and (4) of this section all ... permanent stoppings ... installed after June 10, 1996, shall be constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls.
30 C.F.R. § 75.333(e)(1)(i) (emphasis added). MSHA promulgated this version of the rule in 1996 and published a preamble to the standard.
*995 Safety Standards for Underground Coal Mine Ventilation, 61 Fed. Reg. 9764, 9783-84 (Mar. 11, 1996). The standard itself does not define the methods or materials that have been "traditionally accepted," but the preamble notes that, "[s]ince the inception of the Mine Act, a number of traditionally accepted construction methods have performed adequately and have served their intended function of separating air courses." Joint Appendix ("JA") at 211 ( 61 Fed. Reg. 9783 ). The preamble goes on to list "traditionally accepted construction methods," including:
[1] 8-inch and 6-inch concrete blocks (both hollow-core and solid) with mortared joints;
[2] 8-inch and 6-inch concrete blocks dry-stacked and coated on both sides with a strength enhancing sealant suitable for dry-stacked stoppings;
[3] 8-inch and 6-inch concrete blocks dry-stacked and coated on the high pressure side with a strength enhancing sealant suitable for dry-stacked stoppings;
[4] steel stoppings (minimum 20-gauge) with seams sealed using manufacturer's recommended tape and with the tape and perimeter of the metal stopping coated with suitable mine sealant; and
[5] lightweight incombustible cementatious masonry blocks coated on the joints and perimeter with a strength enhancing sealant suitable for dry-stacked stoppings.
Id. ( 61 Fed. Reg. 9783 ).
Peabody Twentymile's Foidel Creek Mine utilizes two types of ventilation stoppings: (1) temporary metal panel stoppings; and (2) permanent concrete block stoppings. The concrete block stoppings are constructed at Peabody Twentymile by stacking concrete blocks, covering the blocks on their face with a strength-enhancing bonding agent, and sealing the sides and tops of the stoppings with polyurethane foam. Peabody Twentymile has been utilizing this method to construct block stoppings since at least 1991. Further, Peabody Twentymile has included its use of polyurethane foam to seal the perimeters of ventilation stoppings in its ventilation plans since 1991. These ventilation plans have been reviewed and approved by the Secretary of Labor (the "Secretary") at least once every six months. See 30 U.S.C. § 863(o) ; 30 C.F.R. § 75.370(g).
During an August 5, 2014, inspection of the Foidel Creek Mine, an MSHA inspector and MSHA assistant district manager noticed that the perimeter of one concrete block stopping was sealed with Touch 'n Seal polyurethane foam and lacked any strength-enhancing sealant around the perimeter behind the foam. After the inspection, the MSHA inspector issued a citation alleging a violation of 30 C.F.R. § 75.333(e)(1)(i) with regard to the concrete block stopping. The citation read, in part:[1]
The stopping was not built in a traditionally accepted method that has demonstrated to perform adequately. The following conditions were observed;
1.) The perimeter of the stopping was not sealed with mortar.
2.) The perimeter of the stopping was sealed [wi]th touch N seal foam measuring approximately 0 to 6 inches along the ribs and roof.
JA at 198. There is no dispute the MSHA had never issued a citation to Peabody Twentymile for its use of polyurethane foam prior to the 2014 citation.
*996 Peabody Twentymile contested the citation before a Commission ALJ. After a hearing on the merits, the ALJ issued a decision upholding the citation for violating 30 C.F.R. § 75.333(e)(1)(i) as well as the $162 penalty imposed against Peabody Twentymile for the violation. The ALJ found the traditionally accepted construction methods listed in the regulation's preamble to be exhaustive and not inclusive of the construction method Peabody Twentymile used for its concrete block stoppings.
Peabody Twentymile petitioned the Commission for discretionary review of the ALJ's decision, and the Commission granted review. Two Commission members voted to affirm the ALJ's decision, and two Commissioners voted to reverse the ALJ's decision. The two affirming Commissioners disagreed about the degree of deference owed to the Secretary's interpretation of § 75.333(e)(1)(i). They both found, however, that the Secretary's interpretation was entitled to deference and voted to affirm the ALJ's findings that Peabody Twentymile had not constructed the concrete block stoppings using a "traditionally accepted method" in violation of § 75.333(e)(1)(i).
The reversing Commissioners found that "traditionally accepted method" has a plain meaning and that MSHA had "traditionally accepted" Peabody Twentymile's use of polyurethane foam to seal the perimeter of its block stoppings because it had not issued previous citations for the practice and had consistently approved the mine's ventilation plans. The reversing Commissioners noted,
[I]t strains credulity to characterize MSHA's continuous approval of Peabody Twentymile's use of polyurethane foam for over 31 years as 'an error' when that approval took the form of explicit approval of its ventilation plans, at least 60 reviews of that plan, and hundreds of inspections covering hundreds of block stoppings without issuing a single citation.
JA at 264. They also concluded that "it defies credulity to assert that MSHA allowed an unsafe practice to exist for three decades in a large and important underground coal mine." Id. The reversing Commissioners noted that, even if 30 C.F.R. § 75.333 were ambiguous, the Secretary's interpretation should not be entitled to deference because neither the regulation nor the preamble prohibits the method and the Secretary's enforcement practices prior to 2014 do not align with the Secretary's current interpretation.
As a result of the Commissioners' split decision, the ALJ's decision stood as though affirmed. See Plateau Mining Corp. , 519 F.3d at 1191 ; Sec'y of Labor, Mine Safety & Health Admin. v. Penn. Elec. Co. , 12 FMSHRC 1562, 1563-65 (1990), aff'd on other grounds , 969 F.2d 1501 (3d Cir. 1992).
II.
Because there is no majority decision from the Commission, we review the ALJ's factual findings for substantial evidence and legal conclusions de novo. Plateau Mining Corp. , 519 F.3d at 1191. Questions of statutory and regulatory interpretation are also reviewed de novo. Bridger Coal Co. v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor , 669 F.3d 1183, 1190 (10th Cir. 2012).
The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Ceco Concrete Constr., LLC v. Centennial State Carpenters Pension Tr. , 821 F.3d 1250, 1258 (10th Cir. 2016) (quoting *997 Robinson v. Shell Oil Co. , 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ). When interpreting an administrative regulation, "we apply the same rules we use to interpret statutes. We begin by examining the plain language of the text, giving each word its ordinary and customary meaning. If, after engaging in this textual analysis, the meaning of the regulations is clear, our analysis is at an end." Mitchell v. Comm'r , 775 F.3d 1243, 1249 (10th Cir. 2015) (citations omitted). If the regulation is unambiguous, we will enforce it in accordance with its plain meaning, giving no deference to a contrary interpretation by the Secretary of Labor. See id.
This case turns on the meaning of 30 C.F.R. § 75.333(e)(1)(i), which requires permanent ventilation stoppings to "be constructed in a traditionally accepted method and of materials that have been demonstrated to perform adequately or in a method and of materials that have been tested and shown to have a minimum strength equal to or greater than the traditionally accepted in-mine controls." The "method" at issue in this case is the use of polyurethane foam to seal the perimeters of concrete block stoppings. The parties acknowledge that Peabody Twentymile's method for constructing block stoppings has not undergone strength testing,[2] and Peabody Twentymile does not argue that its method complies with any of the five methods for stopping construction listed in the regulation's preamble. As a result, Peabody Twentymile's use of foam must be within the meaning of "traditionally accepted method" as that phrase appears in the regulation itself.
The question in this case, then, is what constitutes a "traditionally accepted method" of construction as that term is used in § 75.333(e)(1)(i). The terms "traditionally" and "accepted" are not defined in the standard. The absence of a definition in the standard, however, does not necessarily make the term ambiguous. In these circumstances, we apply the ordinary or dictionary definitions of the terms. Jones v. Comm'r , 560 F.3d 1196, 1200-01 (10th Cir. 2009) (applying plain meaning of 26 U.S.C. § 1221(a)(3)(B) to conclude taxpayer's charitable donation of discovery material to museum, which was "prepared or produced" for the taxpayer, could not be used to claim tax deduction).
In or around 1996 when the regulation was promulgated, "traditionally" was defined as: "[i]n a traditional manner; by, in the way of, or according to tradition." Oxford English Dictionary (2d ed. 1989). The plain and ordinary meaning of "tradition" was "[a] long established and generally accepted custom or method of procedure, having almost the force of a law." Id. "Tradition" was also defined as "[a] time-honored practice." The American Heritage Dictionary of the English Language (3d ed. 1996). "Accepted" was defined as "[w]idely encountered, used, or recognized," id. , and as "[r]eceived as offered; well-received; approved" or "[h]ence, satisfactory, acceptable," Oxford English Dictionary (2d ed. 1989). "Traditionally accepted," therefore, means "approved of in a customary manner or regularly over a period of time." Under this interpretation, a method that was repeatedly accepted by MHSA inspectors over a considerable period of time would satisfy the definition of "traditionally accepted."
The Secretary disagrees with this definition of "traditionally accepted" and argues that a method can only be "traditionally accepted" if it appears on the list of methods *998 in the preamble of the regulations. The problem with the Secretary's interpretation, however, is that it is inconsistent with the plain language of the regulation. The regulation's plain language is broader than the Secretary suggests and points to a definition of "traditionally accepted" as a method approved of over a period of time. There is nothing in the language of the regulation that suggests that a traditionally accepted method is somehow further limited. Indeed, as the Secretary points out, there could be many ways in which a method could become traditionally accepted under the plain language of the regulation. Aple. Br. at 19. For example, a method could be accepted by MHSA inspections over a considerable period of time, through long-recognized industry standards, or by regulations that limit or define such methods. See id. The broad language of the regulation would permit all of these methods to qualify as "traditionally accepted."
The Secretary points out, and we acknowledge, that a regulation is "ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc. , 764 F.3d 1199, 1226 (10th Cir. 2014) (quotation marks omitted). But that is not the case here. The term "traditionally accepted," while broad, is not ambiguous, and we are not required to go searching for conflicting interpretations.
Moreover, while the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself. See Blue Mountain Energy v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor , 805 F.3d 1254, 1259-61 (10th Cir. 2015) (stating that an ALJ may use the preamble of a regulation as one tool to evaluate expert witness credibility, but should not treat the preamble as binding law (citing Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs , 746 F.3d 1119, 1124-25 (9th Cir. 2014) (recognizing that a regulatory preamble is not legally binding because it is not subject to notice and comment, but it may be used to inform an ALJ's understanding of a scientific issue))); see also Nat'l Wildlife Fed'n v. EPA , 286 F.3d 554, 569-70 (D.C. Cir. 2002) ("The preamble to a rule is not more binding than the preamble to a statute. A preamble no doubt contributes to the general understanding of a statute, but it is not an operative part of the statute." (quotations omitted)); Wyo. Outdoor Council v. U.S. Forest Serv. , 165 F.3d 43, 53 (D.C. Cir. 1999) ("[L]anguage in the preamble of a regulation is not controlling over the language of the regulation itself."). Here, the limitations that appear in the preamble do not appear in the language of the regulation, and we refuse to engraft those limitations onto the language. Accordingly, after reviewing the language of this key phrase, we find the meaning of the regulation to be plain and unambiguous. See Mitchell , 775 F.3d at 1249.
III.
Because the term "traditionally accepted" has an ordinary and plain meaning, our inquiry is whether Peabody Twentymile's use of polyurethane foam to seal the perimeters of concrete block stoppings was "traditionally accepted" in a manner consistent with the regulation. Peabody Twentymile argues that its use of foam was traditionally accepted because MSHA generally assented to or approved of Peabody Twentymile's construction method *999 over a considerable period of time.[3] We agree.
The record shows longstanding acceptance by MSHA of the method in which Peabody Twentymile constructed its concrete block stoppings. The mining operator used foam to seal hundreds of block stoppings over multiple decades. Prior to receiving the citation in 2014, Peabody Twentymile had employed the same method to seal the perimeter of its block stoppings since at least 1991. Peabody Twentymile's use of polyurethane foam to seal its concrete block stoppings preceded MSHA's 1996 promulgation of the regulation approving the use of "traditionally accepted methods." After 1996, Peabody Twentymile continued to use polyurethane foam to seal the perimeters of its concrete block stoppings for eighteen years on hundreds or even thousands of stoppings.
These ventilation stoppings were subject to MSHA's four quarterly inspections each year between 1996 and 2014, and they were also subject to numerous spot inspections. In fact, the reversing Commissioners examined MSHA's records and found that over 800 inspections had occurred at the Foidel Creek Mine since 1995. JA at 258.[4] The Secretary concedes that MSHA issued no citations to Peabody Twentymile regarding the use of foam on block stoppings at any point prior to the 2014 citation at issue. Aple. Br. at 8.
Additionally, MSHA reviewed and approved Peabody Twentymile's use of polyurethane foam in Peabody Twentymile's ventilation plans at least once every six months. See 30 U.S.C. § 863(o) ; 30 C.F.R. § 75.370(g). A ventilation plan approved by the MSHA district manager that is "suitable to the conditions and mining system" at the Foidel Creek Mine is a prerequisite for Peabody Twentymile's lawful operation of the mine. See 30 C.F.R. § 75.370(a)(1) ; 30 U.S.C. § 836(o). Peabody Twentymile's 1991, 2000, and 2011 plans provided that "[f]oam application for ventilation devices will be limited to sealing cracks and perimeters of ventilation devices," JA at 193, and that Peabody Twentymile's "[a]pplication of foam for ventilation device installation will be limited to sealing the perimeter and joints of such devices," JA at 205; see also JA at 195. The Secretary does not dispute that each of these plans was approved by MSHA.
The Secretary all but concedes that it approved of Peabody Twentymile's polyurethane foam method for many years. The Secretary acknowledges both that it issued no citations for Peabody Twentymile's use of the foam, even after hundreds of inspections, and that it approved foam use on ventilation devices in Peabody Twentymile's ventilation plans. This evidence demonstrates that Peabody Twentymile employed a "traditionally accepted method" for constructing its ventilation stoppings. Because we conclude that the foam method employed at Peabody Twentymile's Foidel Creek Mine was traditionally accepted by MHSA, we reverse the decision of the ALJ.
IV.
For the reasons stated above, we GRANT the petition for review, REVERSE
*1000 the decision of the ALJ, and VACATE the citation.

The citation was modified after originally issued. The modified language is included here.

Peabody Twentymile asserts that the strength of the concrete block stoppings that are sealed with foam around the perimeter is not in jeopardy because the faces of the stoppings are sealed with mortar. Aplt. Br. at 24.

Because the ALJ concluded that the preamble contained an exhaustive list of traditionally accepted methods that did not include Peabody Twentymile's method, the ALJ did not analyze whether Peabody Twentymile's construction method for block stoppings was "traditionally accepted" according to the plain meaning of that phrase.

The reversing Commissioners specifically cite to: Mine Inspections, U.S. Department of Labor, Mine Data Retrieval System, https://arlweb.msha.gov/drs/drshome.htm and directing user to "search for Foidel Creek's Mine ID, '0503836'; then choose 'Inspections,' enter '1/1/1995' as the Beginning Date, and click 'Get Report.' "