**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1192**

KATHERIN ESCARLETH MEJIA-VELASQUEZ, a/k/a Katherin Esarleth Mejia-Velasquez,

     Petitioner,

  v.

MERRICK B. GARLAND, Attorney General,

     Respondent.

**No. 20-1628**

KATHERIN ESCARLETH MEJIA-VELASQUEZ, a/k/a Katherin Esarleth Mejia-Velasquez,

     Petitioner,

  v.

MERRICK B. GARLAND, Attorney General,

     Respondent.

On Petitions for Review of Orders of the Board of Immigration Appeals.

Argued: December 8, 2021      Decided: February 15, 2022

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

Decisions affirmed and petitions for review denied by published opinion. Judge Niemeyer wrote the opinion, in which Judge Richardson joined. Judge Motz wrote a dissenting opinion.

**ARGUED:** Evelyn Rose Griggs Smallwood, HATCH ROCKERS IMMIGRATION, Durham, North Carolina, for Petitioner. Rachel Louise Browning, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Jeffrey Bossert Clark, Acting Assistant Attorney General, Jessica E. Burns, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

NIEMEYER, Circuit Judge:

Katherin Mejia-Velasquez, a native and citizen of Honduras who entered the United States without inspection in February 2016, applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because Mejia-Velasquez failed to produce biometrics (such as her photograph, fingerprints, and signature) in support of her application, after having been warned of the consequences of failing to do so, the immigration judge ("IJ") deemed her application abandoned pursuant to 8 C.F.R. §§ 1003.47(c) and 1208.10 and ordered her removed to Honduras. The Board of Immigration Appeals ("BIA") affirmed in a decision dismissing her appeal.

In her petition for review, Mejia-Velasquez contends that the BIA's decision should be vacated and her case remanded for consideration of her application on the merits. She argues mainly that she did not receive sufficient notice that she was required to provide biometrics, as specified in 8 C.F.R. § 1003.47(d), and that the BIA's decision upholding the notice given in this case relied on its erroneous decision in *Matter of D-M-C-P-*, 26 I. & N. Dec. 644 (BIA 2015), which misinterpreted the regulation by eclipsing a portion of its requirements. Spelling out the distinction between what the decision in *Matter of D-M-C-P-* held § 1003.47(d) to require and what the regulation actually requires, she argues that *Matter of D-M-C-P-* should be given no deference, noting that § 1003.47(d) is unambiguous and, in any event, the decision is not a reasonable interpretation of the regulation. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019). Therefore, she concludes, the BIA erred in relying on *Matter of D-M-C-P-*.

3

While we agree with Mejia-Velasquez that *Matter of D-M-C-P-* is not entitled to *Kisor* deference, we conclude that the record demonstrates that she received notice that substantially complied with the requirements of § 1003.47(d). Accordingly, we affirm the BIA's decision and deny her petition for review. We also deny her subsequent petition for review of the BIA's refusal to grant her motion for reconsideration of its decision.

I

After Mejia-Velasquez entered the United States without inspection, she filed an I-589 application for asylum, withholding of removal, and protection under CAT, claiming that she and other members of her family had been the victims of physical harm due to their membership in a particular Honduran political party, as well as their affiliation with a family member who was elected mayor of the family's hometown as a member of that same party.

On February 7, 2017, she appeared with counsel before an IJ in Charlotte, North Carolina, at a master calendar hearing. As typical of such hearings, the IJ confirmed preliminary matters contained in Mejia-Velasquez's application with Mejia-Velasquez and her counsel, conceding removability, designating Honduras as her destination in the event of removal, confirming Spanish as her "best language," and clarifying her address. The IJ also scheduled an "individual hearing" for March 12, 2018, and warned counsel that documents not submitted before 15 days of that date would be "deemed waived or abandoned." The IJ then said:

> And, finally, [the Department of Homeland Security counsel] is serving your
> client with biometrics instructions. Make sure she has her fingerprints taken

by the time of her individual hearing. If she doesn't have her fingerprints done and completed by that day, I'm going to — deny her application for lack of completeness. Do you understand that?

Mejia-Velasquez's counsel responded, "Yes, Your Honor." While the transcript of the hearing does not reflect it, the IJ also provided Mejia-Velasquez with a written notice entitled "Fingerprint Warning" that he regularly distributed to applicants and which Mejia-Velasquez does not dispute having received. The Fingerprint Warning provided:

> The Department of Homeland Security ["DHS"] has provided Respondent with instructions to provide his or her fingerprints and biographical information to the DHS as part of their Form I-589 (Application for Asylum and for Withholding of Removal) filed with the Court. Respondent shall submit his or her fingerprints and other biographical information to the DHS for all required identity, law enforcement, or security investigations in accordance with these instructions. 8 C.F.R. § 1003.47(b). Failure by Respondent to follow these instructions and submit the required information before their scheduled individual hearing will constitute **abandonment** of Respondent's Form I-589 application. 8 C.F.R § 1003.47(c); *Matter of D-M-C-P-*, 26 I&N Dec. 644, 649 (BIA 2015). If Respondent's Form I-589 application is abandoned, the DHS may request that the Court **deny** Respondent's claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. 8 C.F.R § 1003.47(d).
>
> You must have your fingerprints taken within **45 DAYS** of today's date in order to provide DHS with sufficient time to process your prints.

Pursuant to the schedule established, Mejia-Velasquez (now represented by new counsel) appeared before the same IJ on March 12, 2018, for her individual hearing. When the IJ was informed that Mejia-Velasquez had not provided the DHS with her biometrics, the IJ sought confirmation of that fact from her counsel who, after consulting with Mejia-Velasquez, confirmed that the information was "accurate." The IJ then said:

> On February 7th, 2017, I gave her a fingerprint warning and the Government served biometric instructions on her. Advised her that she was going to be

5

required to take her fingerprint[s] — as part of her application process and, if she didn't, that, that would lead to an incomplete asylum application. That's a part of the asylum regulations.

When the government moved to pretermit Mejia-Velasquez's application for immigration relief because of her failure to provide biometrics, the IJ stated that he was going to grant the motion and would send out an order doing so. At the conclusion of the hearing, the IJ asked Mejia-Velasquez's counsel, "Is there anything else before we adjourn?" Counsel replied, "No, Your Honor."

On March 12, 2018, the IJ issued his order granting the government's motion to pretermit Mejia-Velasquez's application. He found that, during the February 7, 2017 master calendar hearing, Mejia-Velasquez had "received notice and instructions on how to submit her fingerprints and biometrics" and that she had also been advised, "through counsel, of the consequences for failure to comply" with those instructions by the relevant deadline. He found that Mejia-Velasquez "did not timely submit the required biometrics" and that she had not presented sufficient evidence that her failure to do so "was the result of good cause." As a consequence, he found that "no good cause exists for a continuance" of Mejia-Velasquez's proceedings. Accordingly, the IJ held that Mejia-Velasquez had, by virtue of 8 C.F.R. §§ 1003.47(c) and 1208.10, "abandoned her Form I-589 application" for relief and ordered that she be removed to Honduras.

On appeal to the BIA, Mejia-Velasquez challenged the IJ's order on the grounds that the IJ had erred in failing to "consider the reasons [for her] failure to submit her fingerprints" and to "give [her] an opportunity . . . to explain herself." She claimed that she did, in fact, have a "good and legitimate cause" for not complying with the biometrics

6

requirements — namely, that she was not properly informed of those requirements because the IJ did not direct the courtroom translator to translate into Spanish the relevant oral and written instructions. Nor did her previous counsel "tell her about the fingerprints and the consequences of not submitting them."

The BIA agreed with the IJ's conclusion that Mejia-Velasquez's failure to timely comply with the biometrics requirements "warrant[ed] a determination that [she] abandoned her application," and by an order dated January 22, 2020, it dismissed Mejia-Velasquez's appeal. Relying on its earlier interpretation of § 1003.47(c) and (d) in *Matter of D-M-C-P-*, the BIA concluded that Mejia-Velasquez "was provided adequate notice and instructions on how to submit her fingerprints and biometrics information and was specifically advised of the consequences of a failure to comply with such instructions by the established deadline." The BIA dismissed as "unavailing" her argument regarding the IJ's failure to provide for a Spanish translation of the biometrics instructions, reasoning that it was "incumbent upon [her] counsel" to ensure that she understood the instructions.

Following the BIA's decision, Mejia-Velasquez simultaneously filed a motion for reconsideration with the BIA and a petition for review in this court. In her motion for reconsideration, she identified three categories of error in the BIA's decision, arguing (1) that the BIA had erred in upholding the IJ's determination that she had abandoned her application; (2) that the BIA had not responded to her argument on appeal that the IJ had failed to provide her with an opportunity to show "good cause" for not complying with the biometrics requirements; and (3) that the BIA's analysis of the IJ's decision-making had

7

improperly required her to show prejudice and was marred by impermissible and "clearly erroneous" factfinding.

The BIA denied her motion for reconsideration on May 27, 2020, concluding that she "fail[ed] to identify any errors of fact or law in [its] prior decision or an argument or aspect of the case that was overlooked."  Mejia-Velasquez then filed another petition in this court to review the BIA's denial of her motion for reconsideration.

On Mejia-Velasquez's motion, we entered an order dated June 8, 2020, consolidating her two petitions for review.

II

For her principal argument, Mejia-Velasquez contends that she was improperly advised of her obligation to provide biometrics, as required by 8 C.F R. § 1003.47(d), and that the BIA's holding to the contrary was based on its own flawed interpretation of § 1003.47(d) in *Matter of D-M-C-P-*, 26 I. & N. Dec. 644 (BIA 2015).  She explains that while § 1003.47(d) requires that the DHS (1) "notify the [applicant] of the need to provide biometrics and other biographical information," (2) "provide a biometrics notice," and (3) provide "instructions to the [applicant] for such procedures," the BIA's decision in *Matter of D-M-C-P-* holds that only requirements (1) and (3) need be fulfilled.  As a consequence, she argues, that decision is not entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), and *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).  And because the BIA erroneously concluded that the DHS's duties were satisfied by only complying with requirements (1) and (3), she reasons that she cannot be deemed to have abandoned her

8

I-589 application for asylum and other relief. She also suggests that the BIA's erroneous interpretation of § 1003.47(c) and (d) is not simply a technical oversight but that it has led to consequences more far-reaching, as hers in this case demonstrate.

Under the practice authorized by *Matter of D-M-C-P-*, the DHS provides applicants at a hearing *only with instructions* for providing biometrics and not a written notice of the biometrics requirement. Mejia-Velasquez argues that not providing the written notice *at the hearing*, which apparently was the process that the DHS followed, imposes the risk that the DHS could fail to give the applicant any written biometrics notice, for which the applicant would then be held responsible. She explains that under the DHS's process, as described in the instructions that the DHS provides to applicants at the hearing, once an applicant files a copy of the first three pages of the applicant's I-589 application and other required documents with the "USCIS [United States Citizenship and Immigration Services] Nebraska Service Center," the Center will send the applicant an "ASC [Application Support Center] notice," which contains "instructions for each person to appear for an appointment at a nearby ASC for collection of biometrics (such as [the applicant's] photograph, fingerprints, and signature)." The instructions note further that if the applicant does not receive the ASC notice, the applicant should call a designated telephone number. Mejia-Velasquez argues that this process is "onerous" and "complicated," and it "makes the applicant responsible for DHS's failures with devastating results." Nonetheless, she asserts (in a contention first made in her motion for reconsideration before the BIA) that she, in fact, submitted the required documents to the Nebraska Service Center prior to her

master calendar hearing but did not receive an ASC notice. She makes no claim, however, that she called the designated phone number, as required by the instructions.

At bottom, Mejia-Velasquez urges that we vacate the BIA's decision and remand her case for consideration of her application on the merits.

While the government recognizes that the BIA relied on *Matter of D-M-C-P-*, it contends that *Matter of D-M-C-P-* did not purport to construe the regulation but rather "simply considered whether the [IJ] in that case had fulfilled his obligation of setting a time limit before declaring the petitioner's application abandoned." And at oral argument, the government contended additionally that, in any event, the "Fingerprint Warning" that the IJ provided to Mejia-Velasquez at the February 7, 2017 master calendar hearing constituted "a biometrics notice" for purposes of § 1003.47(d).

We begin with the text of § 1003.47(d), which provides:

> At any hearing at which a respondent expresses an intention to file or files an application for relief for which [biometrics are required] . . . DHS shall notify the respondent of the need to provide biometrics and other biographical information and shall provide a biometrics notice and instructions to the respondent for such procedures. The immigration judge shall specify for the record when the respondent receives the biometrics notice and instructions and the consequences for failing to comply with the requirements of this section.

8 C.F.R. § 1003.47(d). This regulation thus requires that, at the relevant hearing, the DHS (1) "notify" the applicant of the need to provide biometrics, (2) "provide" the applicant with "a biometrics notice," and (3) "provide" the applicant with "instructions" for providing biometrics. Construing this regulation in *Matter of D-M-C-P-*, however, the BIA held that the IJ must, on the record:

10

(1) ensure that the DHS has *advised the applicant* of the need to provide biometrics and other biographical information and has *furnished the appropriate instructions*; (2) inform the applicant of the deadline for complying with the requirements of which he has been notified; and (3) inform the applicant of the consequences of noncompliance, including the possibility that the application will be deemed abandoned and dismissed, unless the failure to comply resulted from good cause.

*Matter of D-M-C-P-*, 26 I. & N. Dec. at 648–49 (emphasis added). Thus, with respect to the regulation's three requirements, the BIA's interpretation in *Matter of D-M-C-P-* requires the DHS to satisfy only the first and the third, omitting the requirement that it provide "a biometrics notice."

In this case, the BIA concluded that, because the DHS had provided Mejia-Velasquez with all of the information required by *Matter of D-M-C-P-*, the DHS had satisfied the requirements of § 1003.47(d), as well. On this basis, it deemed Mejia-Velasquez's application abandoned. As the BIA said, she "was provided adequate notice and instructions on how to submit her fingerprints and biometrics information and was specifically advised of the consequences of a failure to comply with such instructions by the established deadline."

We agree with Mejia-Velasquez on two points that she makes. First, we agree that the regulation is unambiguous as to the three requirements specified — oral notification, a biometrics notice, and instructions. We also agree that *Matter of D-M-C-P-*, when construing the regulation, omitted the requirement for providing applicants with "a biometrics notice."

In suggesting that *Matter of D-M-C-P-* adequately summarized the regulation, the government diminishes the distinction between orally notifying an applicant of

11

requirements and providing the applicant with a written notice. And in doing so, it misreads the regulation by suggesting that both requirements are essentially the same. First, as a matter of a straightforward reading, we conclude that "a biometrics notice" means a *tangible, written* notice. We deduce that from the fact that the regulation includes both the requirement that DHS "notify" the applicant and the requirement that it provide the applicant with "a biometrics notice." Moreover, "biometrics notice" is preceded by an article, suggesting a tangible, written notice. *See, e.g.*, *Merriam-Webster's Collegiate Dictionary* 848 (11th ed. 2020) (defining "notice" when coupled with the indefinite or definite article to mean "a written or printed announcement"). By collapsing the DHS's obligation to "notify" and to "provide a biometrics notice," the government's interpretation effectively eliminates one of the three requirements imposed by § 1003.47(d), which in turn has led to the DHS's current procedures.

Accordingly, the BIA's interpretation of § 1003.47(d) in *Matter of D-M-C-P-* is not entitled to deference under *Kisor* for at least two reasons. First, the regulation is not "genuinely ambiguous" with respect to these requirements, as required by *Kisor*. 139 S. Ct. at 2415. Second, even if the regulation was ambiguous, the BIA's interpretation is not a reasonable one because it fails to account for a distinct requirement in the regulation — the requirement that the DHS provide an applicant with "a biometrics notice." *See id.* at 2415–16.

The government's alternative argument that *Matter of D-M-C-P-* did not purport to construe § 1003.47 is also untenable. The analysis contained in *Matter of D-M-C-P-* quotes extensively from § 1003.47(c) and (d), *see* 26 I. & N. Dec. at 648, and expressly provides

12

requirements to "ensure that an asylum applicant receives proper notice of the biometrics requirements" articulated in § 1003.47, *id.* at 648–49. Thus, the decision's discussion of § 1003.47(c) and (d) was clearly an effort to construe the regulation applicable here, as indeed the BIA recognized when it relied on that decision in deeming Mejia-Velasquez's application abandoned.

But the government's final argument fares better. The government contended at oral argument that regardless of whether *Matter of D-M-C-P-* properly interprets § 1003.47, Mejia-Velasquez actually received a biometrics notice in this case because one was provided to her by the IJ at her February 7, 2017 master calendar hearing. That document, entitled "Fingerprint Warning," contained all the information that could reasonably be contemplated by the regulation's requirement of "a biometrics notice." The Fingerprint Warning included notice that "Respondent shall submit his or her fingerprints and other biographical information to the DHS for all required identity, law enforcement, or security investigations in accordance with [the provided] instructions. 8 C.F.R. § 1003.47(b)." It warned of the consequences for failing to do so, providing, "Failure by Respondent to . . . submit the required information before their scheduled individual hearing will constitute **abandonment** of Respondent's Form I-589 application. . . . [And] the DHS may request that the Court **deny** Respondent's claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. 8 C.F.R § 1003.47(d)." Finally, it set a deadline, requiring that Mejia-Velasquez have her "fingerprints taken within **45 DAYS** of today's date in order to provide DHS with sufficient

time to process your prints." We conclude that the content of this document was sufficient to constitute "a biometrics notice."

It is true that the Fingerprint Warning was provided to Mejia-Velasquez by the IJ, whereas the regulation requires that "a biometrics notice" be provided by the DHS. But we conclude that the IJ's provision of this notice constituted substantial compliance with the regulation. All doubt would surely be eliminated if the DHS were to formulate its own biometrics notice and routinely provide it to each applicant at the applicant's first hearing. And we see no reason, moreover, why the DHS could not include the instructions for providing biometrics in that notice, thereby giving the applicant only one document. Nonetheless, it is apparent that the IJ's provision of the Fingerprint Warning in this case satisfied the essential purpose of the regulation.

The dissent contends that the provision of the Fingerprint Warning did not constitute substantial compliance with the regulation, maintaining that "'a biometrics notice' must mean a document that provides a date and time to have one's biometrics collected." *Infra* at [31]. Not only does the dissent's conclusion lack any support from the text of § 1003.47 or any other regulation, it makes no sense. In particular, the dissent fails to explain how the biometrics notice given to the applicant at her initial hearing must include the date and time for her biometrics appointment when the applicant is, at the same time, given instructions explaining the steps necessary to obtain that appointment. Thus, while the dissent recognizes that the applicant must be provided with *both* a biometrics notice *and* instructions at the hearing, the dissent finds the biometrics notice deficient because it does not contain the date and time of the appointment *that was to be obtained by following the*

14

*instructions*. The dissent's position is, in short, a logical impossibility. The fact remains that the biometrics notice given to Mejia-Velasquez provided her with all the information that could be expected from such a notice, especially when the notice is accompanied by instructions for obtaining an appointment to actually provide the biometrics.

In sum, while we conclude that *Matter of D-M-C-P-* is not a reasonable interpretation of the requirements imposed by § 1003.47(d), we do conclude that the requirement of § 1003.47(d) to provide "a biometrics notice" was in fact substantially complied with in this case.

### III

Mejia-Velasquez contends further, however, that the biometrics notice required by § 1003.47(d) must come in the form of an "appointment notice" from the USCIS Application Support Center that schedules applicants' appointments for providing biometrics. In support of this contention, she points to language from the regulatory preamble to a 2005 interim rule and request for comment issued by the Department of Justice's Executive Office for Immigration Review. *See* Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals, 70 Fed. Reg. 4743-01 (Jan. 31, 2005). In that preamble, the Department explained the process established by § 1003.47 as follows:

> Upon the applicant's filing of an application for relief with the immigration court . . . *DHS will provide the alien with a standard biometrics appointment notice* prepared by an appropriate DHS office. . . . The DHS fingerprint notice will be hand-delivered to the alien by DHS and . . . must contain at least the alien registration number, receipt number (if any), name, and the form number pertaining to the relief being sought for each person listed. . . .

15

> The immigration judge shall specify for the record when the respondent receives the notice and the consequences for failing to comply with biometrics processing.

*Id*. at 4746 (emphasis added). Mejia-Velasquez contends that this preamble's reference to a "standard biometrics appointment notice" clarifies the nature of the "biometrics notice" called for in § 1003.47(d). And she argues that this understanding is bolstered by the DHS's own "interchangeable use" of the terms "biometrics notice," "ASC notice," and "fingerprint notice."

While this argument might support her criticism of the DHS's current practice, it does not substantially advance her position that § 1003.47(d) was not satisfied at her February 2017 hearing. To be sure, the preamble does indicate that the notice should include some personalized information from the alien's application. But, to the extent there is a conflict between the preamble and the regulation, the regulation must control because a preamble cannot be read to require more than the regulation requires. *See Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) (noting that a regulatory preamble "does not 'control' the meaning of the regulation"); *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) ("[W]hile the preamble can inform the interpretation of the regulation, it is not binding and cannot be read to conflict with the language of the regulation itself").

Thus, notwithstanding the language in the regulatory preamble that Mejia-Velasquez cites, we adhere to the language of the regulation itself and conclude that the Fingerprint Warning that she received at the February 7, 2017 hearing substantially complied with the regulation's requirement of "a biometrics notice."

16

## IV

Finally with respect to her first petition for review, Mejia-Velasquez contends that even if she were provided with a biometrics notice satisfying § 1003.47(d), the IJ nonetheless erred in deeming her I-589 application for relief abandoned and the BIA likewise erred in affirming that conclusion and dismissing her appeal. She makes essentially three arguments, none of which we find persuasive.

## A

First, she contends that the IJ and the BIA erred, as a matter of law, in relying on 8 C.F.R. § 1003.31(c) as a basis for pretermitting her application. That provision grants an IJ the authority to "set and extend time limits for the filing of applications and related documents" and states that "[i]f an application or document is not filed within the time set by the [IJ], the opportunity to file that *application or document shall be deemed waived*." 8 C.F.R. § 1003.31(c) (emphasis added). She argues, however, that that section is not applicable here because biometrics are not an "application or document," as addressed in § 1003.31(c), and therefore that the IJ and the BIA legally erred in relying on it.

While both the IJ and the BIA did cite to § 1003.31(c) in the introductory portions of their decisions, it is clear that they did not rely on that section, but rather on § 1003.47, to deem her application abandoned and dismiss her appeal. For example, after noting that the "failure . . . to provide biometrics . . . within the time allowed by the Immigration Judge constitutes abandonment of the application" and citing § 1003.47(c) and (d), the BIA stated that it

17

agree[d] with the Immigration Judge that the respondent's failure to comply with the biometrics instructions she received on February 7, 2017, warrants a determination that the respondent abandoned her application for relief and protection from removal.

Notably, this analysis features no discussion about an "application or document" or a "waiver" of her application. Rather, the BIA relied on Mejia-Velasquez's failure to provide biometrics as required and the consequential abandonment of her application for her failure to do so, as explicitly addressed in § 1003.47(c) (providing that "[f]ailure to . . . comply with the requirements to provide biometrics . . . constitutes abandonment of the application"). The same approach was taken by the IJ who relied on both § 1003.47(c) and 8 C.F.R. § 1208.10 (providing that "[f]ailure to comply with processing requirements for biometrics and other biographical information within the time allowed will result in dismissal of [an immigration] application, unless the applicant demonstrates that such failure was the result of good cause") to hold that Mejia-Velasquez "abandoned her Form I-589 application." Mejia-Velasquez's argument thus relies on a simple misreading of the IJ and BIA's decisions.

B

Second, Mejia-Velasquez argues that the IJ erred in failing to provide her with *the opportunity* at her March 2018 individual hearing to show "good cause" for her failure to provide biometrics information to the DHS. This argument fares no better.

While § 1003.47(d) gives an applicant an affirmative defense of "good cause" for her failure to provide biometrics, it does not require the IJ to ask her whether she has or will be asserting the affirmative defense. Nonetheless, in this case, the IJ expressly gave

18

Mejia-Velasquez, through her counsel, an opportunity to assert her defense by asking at the end of the hearing, "Is there anything else before we adjourn?" Instead of presenting her defense or at least noting it at that point, her counsel replied simply to the IJ's question, "No, Your Honor."

Notwithstanding the absence of any supporting language in the regulation, the dissent asserts that "§ 1003.47 does require IJs to give applicants the *opportunity* to show good cause, which the IJ failed to do here." *Infra* at [35]. Not only is this proposition novel in the context of any statute or regulation providing an affirmative defense, it finds no support in the text of the regulation. The regulation simply announces that an applicant has a good cause affirmative defense but does not establish any procedure for inviting the applicant to make the defense. Nonetheless, in this case, the IJ did invite Mejia-Velasquez's counsel to present "anything else before we adjourn," which obviously would include any affirmative defense he thought appropriate. As the record shows, however, he stated that he had nothing else to present.

C

Finally, Mejia-Velasquez argues that at the February 7, 2017 master calendar hearing, her due process rights were violated because neither the portion of the hearing during which "she was given the biometrics instructions and warnings" nor the Fingerprint Warning itself was translated into Spanish.

To be sure, we have held that "a fair opportunity to be heard" may be lacking when the government fails to translate for a non-English speaking alien information regarding

19

the charges against her and her legal rights. *United States v. Lopez-Collazo*, 824 F.3d 453, 461–62 (4th Cir. 2016); *see also Gandarillas-Zambrana v. B.I.A.*, 44 F.3d 1251, 1257 (4th Cir. 1995) ("[A]n alien who does not understand English has the right to the services of a translator at his deportation hearing in order to effectuate his right to present evidence and cross-examine witnesses"). But "due process is flexible and calls for such procedural protections as the particular situation demands." *D.B. v. Cardall*, 826 F.3d 721, 743 (4th Cir. 2016) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). And, in applying this flexible approach in immigration proceedings involving non-English speaking applicants, courts have considered such factors as whether the applicant is represented by counsel and whether that counsel objected to any lack of translation. *See Drobny v. I.N.S.*, 947 F.2d 241, 244 (7th Cir. 1991) (rejecting the argument that an alien's due process rights were violated by the lack of a translator at his deportation hearing due in part to the fact that the alien's attorney "did not object to the absence of an interpreter"); *Mei Zi Cui v. Mukasey*, 272 F. App'x 61, 62–63 (2d Cir. 2008) (summary order) (finding no due process violation when, for a Chinese citizen whose native language was Korean, the deportation hearing was translated into Mandarin Chinese because, *inter alia*, the alien's attorney "failed to object when the IJ announced at the beginning of the merits hearing that the official Court interpreter would be speaking Mandarin").

These principles support the conclusion that the lack of translation at Mejia-Velasquez's master calendar hearing did not constitute a due process violation. The hearing was devoted to the IJ's confirmation of procedural and administrative details about Mejia-Velasquez's application and the establishment of a schedule and procedural rules

for future proceedings and not to substantive matters of, for example, evidence presentation or witness cross-examination. And Mejia-Velasquez was represented by counsel throughout. In this context, the IJ advised Mejia-Velasquez's counsel of the biometrics requirements and expressly instructed him to "[m]ake sure she has her fingerprints taken," to which counsel said, "Yes, Your Honor." The combination of the master calendar hearing's procedural and administrative nature and Mejia-Velasquez's representation by counsel is sufficient, in our view, to satisfy the requirements of due process. *See Khan v. Ashcroft*, 374 F.3d 825, 830 (9th Cir. 2004) ("We do not hold that due process *never* requires that the [Government] provide a translation at a master calendar hearing . . . . For purposes of this case, however, it is enough to say that Khan's due process rights were not violated by the failure to provide a translation at *his* master calendar hearing" (emphasis added)).

In sum, we conclude that the BIA did not err in affirming the IJ's conclusion that Mejia-Velasquez had abandoned her application.

V

In her second petition for review, Mejia-Velasquez challenges the BIA's May 27, 2020 order denying her motion to reconsider its January 22, 2020 decision dismissing her application. Such motions must "specify the errors of law or fact in the previous order and shall be supported by pertinent authority." 8 U.S.C. § 1229a(c)(6)(C). And we review the BIA's orders denying such motions for abuse of discretion, reversing only "if the Board

21

acted arbitrarily, irrationally, or contrary to law." *Narine v. Holder*, 559 F.3d 246, 249 (4th Cir. 2009) (citation omitted).

With this governing standard, we find no abuse of discretion here. The BIA permissibly found that Mejia-Velasquez failed to identify any legal error, factual error, or overlooked arguments in its January 22, 2020 decision.

\* \* \*

For the foregoing reasons, the decisions of the BIA are affirmed, and Mejia-Velasquez's petitions for review are

DENIED.

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

Katherin Escarleth Mejia-Velasquez, a twenty-six-year-old native and citizen of Honduras, asserts that, when she lived in her native country, a gang member connected to a political opposition party physically and sexually abused her and her mother, stalked and raped her sister, and murdered her uncle. Rather than remain in Honduras and risk suffering more violence, Mejia-Velasquez entered the United States without authorization. The following month, the Department of Homeland Security ("DHS") initiated removal proceedings against her. Mejia-Velasquez subsequently applied for asylum, withholding of removal, and protection under the Convention Against Torture. But before the immigration judge ("IJ") even addressed whether she had made viable claims for relief, the IJ rejected all her claims on the basis of a single procedural point: she had failed to have her fingerprints taken.

Mejia-Velasquez does not deny that she failed to have her fingerprints taken. She argues, however, that DHS failed to fulfill its *own* obligation to first provide her with a biometrics notice setting a date and time to have her fingerprints taken. I agree that DHS failed to fulfill that obligation and would thus grant the petition for review.

I.

A.

Under 8 C.F.R. § 1003.47, DHS may require certain applicants for relief from removal to submit biometrics — such as fingerprints, a photograph, or a signature — to assist the Government in conducting background investigations on the applicant. If DHS decides to require an applicant to submit biometrics, § 1003.47 first requires DHS to give

23

notice to the applicant. The regulation states that "DHS shall *notify the respondent of the need to provide biometrics* and other biographical information *and shall provide a biometrics notice and instructions* to the respondent for such procedures." 8 C.F.R. § 1003.47(d) (emphasis added). If an applicant subsequently fails to have her biometrics collected, the IJ may deem her application for relief abandoned "unless the applicant demonstrates that such failure was the result of good cause." *Id.* § 1003.47(c), (d).

In an apparent attempt to comply in part with the above notice obligations, one of DHS's agencies — the United States Citizenship and Immigration Services ("USCIS") — has published a document titled "Instructions for Submitting Certain Applications in Immigration Court and for Providing Biometric and Biographic Information to U.S. Citizenship and Immigration Services." According to those instructions, to begin the process of providing biometrics, applicants must mail three documents to USCIS's Nebraska Service Center: (1) a copy of the first three pages of their completed Form I-589 (their application for relief); (2) a copy of Form G-28 (a notice of appearance for the applicant's attorney or representative); and (3) a copy of the instructions themselves.

Once the applicant has done so, the instructions explain that the applicant will receive an Application Support Center ("ASC") notice that "will indicate the individual's unique receipt number and will provide instructions . . . to appear for an appointment at a nearby ASC for collection of biometrics." The instructions further explain that an applicant "*must* wait for and take" her ASC notice to her biometrics appointment. (emphasis added). If an applicant does not receive an ASC notice within three weeks, the instructions direct the applicant to call an 800 number.

24

B.

Mejia-Velasquez followed USCIS's instructions: her counsel mailed the three required documents to the Nebraska Service Center. But when Mejia-Velasquez appeared before the IJ for her master calendar hearing two weeks later, she had not received an ASC notice. Neither Mejia-Velasquez nor the Government mentioned the missing ASC notice to the IJ. On his own accord, the IJ told Mejia-Velasquez's counsel in English that the DHS attorney was "serving [Mejia-Velasquez] with biometrics instructions" and told Mejia-Velasquez's counsel to "[m]ake sure she has her fingerprints taken by the time of her individual hearing." But Mejia-Velasquez does not speak English, and she asserts that her counsel failed to tell her about the IJ's verbal instructions and the interpreter did not translate them into Spanish.

At the same hearing, the IJ also gave Mejia-Velasquez a generic form document in English titled "Fingerprint Warning." The document states that "Respondent shall submit his or her fingerprints and other biographical information to the DHS. . . . Failure by Respondent to follow these instructions . . . before their scheduled individual hearing will constitute abandonment of Respondent's [applications]." That document did not offer Mejia-Velasquez a date and time for an appointment to have her fingerprints taken.

By the time of her individual hearing the following year, Mejia-Velasquez still had not received an ASC notice or had her fingerprints taken.[1] She appeared at that hearing

---

[1] Mejia-Velasquez does not claim to have called the 800 number listed on USCIS's instructions. On appeal, her counsel notes that a USCIS employee has acknowledged that calling the number "is not a fruitful option due to confidentiality issues."

25

with new counsel. At the hearing, the Government told the IJ that Mejia-Velasquez had failed to have her fingerprints taken. The IJ asked Mejia-Velasquez's counsel if that was true, to which her counsel responded, "it appears that's accurate." Neither party's attorney nor anyone else mentioned the missing ASC notice. The Government then moved to pretermit Mejia-Velasquez's application for relief based on her failure to have her fingerprints taken. The IJ granted the motion without first allowing Mejia-Velasquez or her counsel an opportunity to respond. The IJ subsequently asked the Government and Mejia-Velasquez's attorneys if there was "anything else before we adjourn." They added nothing. But the IJ did not make this inquiry until *after* he had already granted the Government's motion. The IJ ordered that Mejia-Velasquez be deported to Honduras.

Mejia-Velasquez appealed to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision and dismissed her appeal. Soon after, USCIS finally issued Mejia-Velasquez an ASC notice. The record does not indicate why USCIS issued the notice at this late date, approximately two years after the IJ had already pretermitted her applications for relief.

Mejia-Velasquez filed both a motion for reconsideration before the BIA and a petition for review of the BIA's decision in this court. The BIA denied her motion for reconsideration. Mejia-Velasquez subsequently filed a petition for review of the BIA's denial of her motion for reconsideration in this court. In this appeal, we have consolidated both of her petitions for review.

II.

Mejia-Velasquez first argues that, although she failed to have her fingerprints taken, DHS failed to fulfill its own obligation under § 1003.47 to first provide a biometrics notice setting a date and time to do so.

This dispute turns on the meaning of the phrase "a biometrics notice" as used in § 1003.47. According to Mejia-Velasquez, "a biometrics notice" refers to a tangible document that provides applicants with a date and time to have their fingerprints taken and/or other biometrics collected. Br. of Petitioner at 15–17. And as Mejia-Velasquez points out, DHS ordinarily provides exactly such a document in the form of an ASC notice; it just failed to do so here. *Id.* The Government disagrees that "a biometrics notice" means a document that provides a date and time to have one's biometrics collected; the Government does not, however, explain what it thinks "a biometrics notice" *does* mean. Br. of Respondent at 18–19.[2]

A.

I begin by examining the text of the regulation at issue. Section 1003.47 states that, "[a]t any hearing at which a respondent expresses an intention to file or files an application for relief for which identity, law enforcement, or security investigations or examinations are required under this section, unless DHS advises the immigration judge that such information is unnecessary in the particular case, DHS shall *notify the respondent of the*

_____

[2] For the first time at oral argument, the Government claimed that "the notice and instructions are one and the same." Oral Arg. at 23:41–46. For reasons explained further below, that contention is unpersuasive.

27

*need to provide biometrics* and other biographical information *and shall provide a biometrics notice and instructions* to the respondent for such procedures." § 1003.47(d) (emphasis added). Neither Mejia-Velasquez nor the Government disputes that DHS "notif[ied] [Mejia-Velasquez] of the need to provide biometrics" and "provide[d] . . . instructions to [her] for such procedures." *Id.* But the parties disagree about whether DHS *also* gave her "a biometrics notice." *Id.*

The text of § 1003.47 makes clear that, even if Mejia-Velasquez were wrong that "a biometrics notice" must specifically refer to an ASC notice, the phrase "a biometrics notice" nonetheless *does* refer to something that DHS decidedly did not give her.

First, § 1003.47 makes clear that "a biometrics notice" must be a *tangible document*, not verbal notice. The regulation specifically refers to the biometrics notice as "*a biometrics notice.*" *Id.* (emphasis added). And as the Supreme Court recently explained in *Niz-Chavez v. Garland*, the "decision to use the indefinite article 'a'" before the word "notice" suggests that the notice must be "a discrete, countable thing." 141 S. Ct. 1474, 1481 (2021). The requirement to provide "a biometrics notice" thus could not have been fulfilled by any verbal notice.

Second, § 1003.47 makes clear that *DHS* must provide an applicant with that tangible document. The regulation specifically states that "*DHS* . . . shall provide a biometrics notice . . . to the respondent." § 1003.47(d) (emphasis added). IJs work for the Department of Justice ("DOJ"), not DHS. 8 C.F.R. § 1003.10(a); 8 C.F.R. § 1003.0(a). The requirement to provide "a biometrics notice" thus could not have been fulfilled by the

28

generic form document that the *IJ* handed Mejia-Velasquez (or by anything else that the IJ did or said).

Third, § 1003.47 makes clear that "a biometrics notice" must be something different than USCIS's *instructions* on how to have one's biometrics collected. The regulation states that DHS "shall provide a biometrics notice *and* instructions." § 1003.47(d) (emphasis added). USCIS has apparently attempted to comply with the regulation's requirement to "provide . . . instructions" by publishing the instructions discussed in Section I.A — the ones that USCIS specifically labels as "Instructions . . . for Providing Biometric[s]," which direct applicants to mail certain documents to its Nebraska Service Center. But under the regulation's own terms, those instructions *cannot* fulfill the separate and additional requirement to "provide a biometrics notice." *Id.* Treating "a biometrics notice" and "instructions" as one and the same would render the use of separate terms superfluous. And of course, "we cannot adopt a reading of [a regulation] that renders part of [it] superfluous over one that gives effect to its 'every clause and word.'" *United States v. Simms*, 914 F.3d 229, 241 (4th Cir. 2019) (en banc) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

Fourth, § 1003.47 makes clear that "a biometrics notice" must do something different than merely provide general notice of the requirement to have one's biometrics collected. The regulation states that "DHS shall notify the respondent of the need to provide biometrics . . . *and* shall provide a biometrics notice." § 1003.47(d) (emphasis added). If I were to interpret the dictate to "provide a biometrics notice" as solely

29

reiterating the dictate to "notify the respondent of the need to provide biometrics," I would again improperly render part of the regulation superfluous.

B.

Considering the above points collectively, I know that "a biometrics notice" must be: (1) a tangible document; (2) that DHS provides applicants for relief from removal; (3) that differs from USCIS's instructions on how to have one's biometrics collected; and (4) that does something other than simply provide general notice of the requirement to provide biometrics.[3] Neither party suggests that DHS provided Mejia-Velasquez with such a document. On that basis alone, I would grant the petition for review.

The majority does not disagree that "a biometrics notice" must be "a *tangible, written* notice." Op. at 11–12. Nor does the majority appear to disagree that DHS did not provide Mejia-Velasquez with such a document. But it nevertheless denies her petition, asserting that, even if DHS failed to comply with its notice obligations under § 1003.47, the generic form document that the *IJ* gave Mejia-Velasquez "constituted substantial compliance with the regulation." Op. at 14; *see also id.* at 4, 15–16.

The majority cites no statute, regulation, or case law explaining why DHS may be excused from fulfilling its notice obligations solely because an IJ decided to provide some notice on his own accord. The parties cite none and I am aware of none. The regulation

---

[3] In holding that DHS fulfilled its obligations under § 1003.47, the BIA and IJ relied on the BIA's contrary interpretation of that regulation in *Matter of D-M-C-P-*, 26 I. & N. Dec. 644 (BIA 2015). For the reasons stated by the majority, I would not defer to the BIA's interpretation of § 1003.47 in *Matter of D-M-C-P-*.

imposes notice obligations on *DHS specifically*. That should have ended our inquiry. We cannot simply transfer the obligations of one agency to another. As judges, "[w]e are no more entitled to denigrate [a] modest [regulatory] promise as some empty formality than we might dismiss as pointless the rules and statutes governing the contents of civil complaints or criminal indictments." *Niz-Chavez*, 141 S. Ct. at 1485.

C.

As explained above, the text of § 1003.47 makes clear that DHS must do something that it failed to do here: provide a tangible document that differs from USCIS's instructions on how to have one's biometrics collected and does not merely provide general notice of the requirement to provide biometrics. The text alone, however, does not necessarily dictate what that document *should* say or do. But when I expand my analysis to consider not only the text but also the regulatory history of § 1003.47, it becomes clear that Mejia-Velasquez is correct: "a biometrics notice" must mean a document that provides a date and time to have one's biometrics collected.

When promulgating § 1003.47 in 2005, the DOJ explained in the published notice of the then-interim regulation that, "[u]pon the applicant's filing of an application for relief with the immigration court or USCIS's referral of the application to an immigration judge, unless DHS informs the immigration judge that new biometrics are not required, DHS will provide the alien with *a standard biometrics appointment notice* prepared by an appropriate DHS office." Background and Security Investigations in Proceedings Before Immigration Judges and the Board of Immigration Appeals, 70 Fed. Reg. 4743-01, 4746 (Jan. 31, 2005)

31

(emphasis added).[4]   In outlining that requirement to provide a "standard biometrics appointment notice," the DOJ's published notice closely mirrors the language of § 1003.47 itself.  *Compare id.*, *with* § 1003.47(d) ("At any hearing at which a respondent expresses an intention to file or files an application for relief[,] . . . unless DHS advises the immigration judge that such information is unnecessary in the particular case, DHS . . . shall provide a biometrics notice . . . to the respondent. . . .").  The DOJ's published notice then further explains that USCIS would need to "develop scheduling procedures and standardized appointment notices" to comply with that requirement.  70 Fed Reg. at 4746.

The DOJ's published notice's mirroring of the language in § 1003.47 suggests that a "biometrics notice" *is* a "standard biometrics appointment notice."  The DOJ's published notice also indicates what that "standard biometrics appointment notice" must do:  offer an appointment for a date and time to have one's biometrics collected.  That is the only possible conclusion to be drawn from the related requirement, appearing in the very next sentence of the DOJ notice, that USCIS "develop scheduling procedures and standardized appointment notices" to comply with that requirement.  *Id.*

In fact, contrary to the position that the Government has taken in this litigation, DHS's own general practice suggests that even *it* agrees it must offer applicants a date and

---

[4] Noting that the relevant language in the DOJ's published notice is found in that notice's preamble, the majority declines to rely on this language, asserting that, "to the extent there is a conflict between the preamble and the regulation, the regulation must control."  Op. at 16.  But there is no conflict between the DOJ's published notice and § 1003.47; the DOJ's published notice merely informs our understanding of the regulation's terms.

32

time to have their biometrics collected. According to the USCIS instructions discussed in Section I.A, applicants for relief from removal will receive an ASC notice that "provide[s] instructions . . . to *appear for an appointment* at a nearby ASC for collection of biometrics." If that language left any doubt that ASC notices provide a date and time to have one's biometrics collected, such doubt is dispelled by looking at the ASC notice that Mejia-Velasquez herself eventually received long after the IJ had pretermitted her applications — it provides a specific date and time to have her biometrics collected.[5]

Moreover, and also contrary to the position that the Government has taken in this litigation, there is evidence that DHS generally views this practice of providing ASC notices as an effort to comply with the requirement to provide a biometrics notice. As Mejia-Velasquez points out, USCIS often treats "biometrics notice," "ASC notice," and related phrases as interchangeable. On a USCIS web page titled *Preparing for Your Biometric Services Appointment*, USCIS interchangeably refers to the notice that applicants must bring to their biometrics appointment as both an "ASC appointment

---

[5] The majority asserts that my interpretation of the phrase "a biometrics notice" "makes no sense" and is "a logical impossibility." Op. at 14–15. Not so. According to the majority, because USCIS *currently* instructs applicants to first mail certain documents to its Nebraska Service Center before they can receive a date and time for their biometrics appointment, DHS could not be expected to provide those instructions *and* a notice with a date and time for an appointment at the same hearing. *Id.* What the majority ignores is that, although § 1003.47 requires DHS to provide biometrics instructions, nothing in the regulation's text or history suggests that those instructions *must* outline a *specific procedure in which applicants must first mail multiple documents to Nebraska.* That may be USCIS's preferred method for collecting biometrics. But the question before us is whether the regulation "tolerates the government's preferred practice." *Niz-Chavez*, 141 S. Ct. at 1478.

notice" and a "biometrics appointment notice[]." *Preparing for Your Biometric Services Appointment*, U.S. CITIZENSHIP & IMMIGRATION SERVS., https://www.uscis.gov/forms/filing-guidance/preparing-for-your-biometric-services-appointment. And in a public agenda for a 2017 quarterly stakeholder meeting, USCIS stated that its Asylum Division will "issue *biometric notices* for *date/time specific appointments* for all cases." *USCIS Asylum Division Quarterly Stakeholder Meeting*, U.S. CITIZENSHIP & IMMIGRATION SERVS. at 4 (Aug. 11, 2017), https://www.uscis.gov/sites/default/files/document/outreach-engagements/PED_AsylumDivisionQuarterlyStakeholderMeeting08112017_QA.pdf (emphasis added).

As a general practice, DHS thus usually *does* attempt to comply with the requirement to provide a biometrics notice by issuing ASC notices. But for whatever reason, it failed to do so here. This failure is no small matter. According to USCIS's own instructions, applicants *must* bring their ASC notice with them to their biometrics appointment. Without an ASC notice, USCIS will not allow an applicant to have her biometrics collected. And with that in mind, it becomes even more difficult to see how the generic form document that the IJ (not DHS) gave Mejia-Velasquez "substantially complied" with DHS's obligation to provide a biometrics notice. Op. at 4, 15, 16. When the time comes for an applicant to have her biometrics collected, a generic form document provided by an IJ is worth little more than the paper it was printed on.

34

III.

I next address Mejia-Velasquez's claim about the good cause doctrine.[6]  On this

claim, Mejia-Velasquez makes three related arguments:  (1) that § 1003.47 requires IJs to

inform an applicant of her *right* to show good cause; (2) that § 1003.47 requires IJs to allow

an applicant the *opportunity* to show good cause; and (3) that the IJ failed to do either in

her case.  Br. of Petitioner at 28–31.  I believe we need not decide whether § 1003.47

requires IJs to inform an applicant of her right to show good cause.  That is so because

§ 1003.47 does require IJs to give applicants the *opportunity* to show good cause, which

the IJ failed to do here.

Section 1003.47 states that an IJ may dismiss an application for relief due to the

applicant's failure to have fingerprints taken "unless the applicant demonstrates that such

failure *was the result of good cause*."  § 1003.47(c), (d) (emphasis added).  The applicant

bears the burden of showing good cause.  But if an IJ grants the Government's motion to

pretermit an applicant's applications for relief without first allowing her even the briefest

---

[6] The Government argues that Mejia-Velasquez failed to exhaust this claim because she did not raise it in her appeal to the BIA.  Br. of Respondent at 20-21.  That argument fails.  Although the Government does not say so explicitly, it may be basing its exhaustion argument on the fact that Mejia-Velasquez only raised this claim in her *notice of appeal* to the BIA and not her *brief* for that appeal.  But that is because there *was no brief* (her counsel failed to timely submit one).  And we have previously held that, where a petitioner fails to raise an issue "in his brief to the BIA" but "did raise the issue in his Notice of Appeal and the BIA went on to address it," we have jurisdiction to review the issue.  *Lizama v. Holder*, 629 F.3d 440, 448–49 (4th Cir. 2011).

opportunity to respond, the IJ will have necessarily prevented the applicant from attempting to make such a showing.[7]

Here, the IJ failed to give Mejia-Velasquez an opportunity to show good cause. Upon learning that she had failed to have her fingerprints taken, the IJ asked the DHS attorney if the attorney had "a motion for the Court"; the DHS attorney responded, "Yes, we move to — pretermit." Because DHS made this motion for the first time at the hearing, Mejia-Velasquez had no opportunity to submit a prior written response. Yet without first allowing either Mejia-Velasquez or her counsel an opportunity to respond verbally, the IJ immediately stated that he would "grant the Government's motion." To try to make a showing of good cause, Mejia-Velasquez or her counsel would have had to yell over the IJ in the middle of his pronouncement, a disturbance that the IJ surely would not have welcomed.

I cannot agree with the majority that the IJ gave Mejia-Velasquez an opportunity to show good cause when he subsequently asked both her counsel and the DHS attorney if there was "anything else before we adjourn." The IJ did not raise that question until *after* he had already granted the Government's motion; any response by Mejia-Velasquez or her counsel would have been a request for reconsideration. Moreover, the IJ directed this

---

[7] The majority asserts that because § 1003.47 "does not establish any *procedure* for inviting the applicant" to show good cause, it must be that applicants need not be afforded even the briefest opportunity to make that showing. Op. at 19 (emphasis added). To be sure, the regulation outlines no specific procedure. But the regulation need not create a specific procedure for me to know that, when a judge denies a party *any* opportunity to make a showing outlined in a regulation, the judge has effectively nullified the party's right to make that showing. Nothing about that proposition is "novel." *Id.*

36

question to both Mejia-Velasquez's counsel and the DHS attorney, indicating that he was asking whether there were *other* matters to discuss rather than offering an opportunity to revisit the merits of a motion he had already granted.[8]

IV.

Under the current immigration statutes, DHS has good reason to require applicants for relief from removal to submit fingerprints and other biometrics. But before DHS does so, it must first comply with specified notice obligations. Where, as here, DHS fails to do so, I would not fault the applicant. As the Supreme Court explained in *Niz-Chavez*, "[i]f men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." 141 S. Ct. at 1486.

I respectfully dissent.

---

[8] Because I would grant Mejia-Velasquez's petition on the above grounds, I would not reach her other claims, except that I would hold that the BIA abused its discretion in denying her motion for reconsideration by continuing to rely on the above legal errors.